[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-11108
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 4, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-01646-CV-CAP

EMANUEL FITZGERALD HAMMOND,

Petitioner-Appellant,

versus

HILTON HALL,
Warden, GD & CC,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 4, 2009)

Before CARNES, MARCUS and PRYOR, Circuit Judges.

CARNES, Circuit Judge:

Julie Love was driving a red Mustang convertible through the upscale Buckhead section of Atlanta around 10:00 p.m. on July 11, 1988. It was one of those typically hot summer nights in Georgia. The petite 27-year-old preschool fitness teacher had been to her regular Monday night "career chat" meeting. She had gotten engaged the week before and may have been thinking about that. Whatever was on her mind, her thoughts were interrupted by the reality of her car slowing to a stop, as cars do when they run out of gas. She steered it over to the side of the road.

This was back before everyone had a cell phone, so Love got out of her stranded car and started walking to get help. After she had gone only a short distance down Howell Mill Road, a maroon Cutlass sedan pulled up beside her. There were two men and a woman inside. They offered Love a ride, but she declined the offer, waving the group on and telling them that she lived in a house just up a nearby driveway. Love didn't live in the house she pointed out or even on that road, but she started walking up the driveway of that house anyway. The Cutlass drove off.

Before the Cutlass had driven completely out of sight of Julie Love, someone in it looked around in time to see her coming back down the driveway to the street. Realizing that she had tricked them about where she lived, Emanuel

2

Hammond, one of the men in the car, ordered the driver to turn around, dim the headlights, and drive slowly back toward the young woman. After the car crept close, Hammond leaped from it with a sawed-off shotgun. He grabbed Love and threw her into the car, face down onto the rear floorboard. While she screamed and begged him not to hurt her, a wild-eyed Hammond beat her with the steel barrel of the shotgun. Any woman in Love's position would have been terrified, and even more so if she had known what Hammond had done to other women.

About six-and-a-half years before, in February 1982, a young woman named Janet[1] was returning home to the Virginia Highlands section of Atlanta around 1:00 a.m., after having a late dinner with her friends. A man named Antonio Stephney came up behind her with a gun. He forced Janet into a dark alley. While Stephney was robbing Janet, Emanuel Hammond appeared on the scene. Hammond told Stephney that it was supposed to be Hammond's robbery. And he suggested to Stephney that "we rob some more places." Stephney agreed. He rooted through Janet's purse, found her keys, and tossed them to Hammond, telling him to go get Janet's car and bring it around. While Hammond went to get her car, Stephney raped Janet. When Hammond got back with the car, the two men forced Janet into

---

[1] We use only this woman's first name in order to protect her privacy.

the back seat, covered her with a blanket, took her to several ATM machines in search of cash, and beat her. While this was going on, Hammond was armed with a sawed-off shotgun.

Hammond drove the car around while Stephney raped Janet a second time and talked about killing her. Hammond, who was only sixteen at the time, evidently did not yet have the stomach for murder. Kidnapping maybe, but not murder. At one point when the car was stopped and Stephney had stepped outside for awhile, Janet begged Hammond to drive away. He hesitated but then sped away as Stephney stood in the street and shot at them with a pistol. After a side trip to his grandfather's house where he got rid of the shotgun, Hammond took Janet to the police station.

By the time Hammond and Janet arrived at the police station, she had been held hostage for three-and-a-half hours and had been raped twice. According to her, Hammond "d[id] the talking" to the police, describing the ordeal in a way that "ma[d]e the people there think that [he and Janet] were both victims." Even so, he was charged with rape and aggravated sodomy. Those charges against him were dismissed in December 1982. The reason probably was that despite his involvement in the crimes against Janet, Hammond's belatedly appearing

4

conscience may have saved her life.  As far as the record shows, that was the last time his conscience would make an appearance, belatedly or otherwise.

The dismissal of the charges against him provided Hammond with an opportunity to straighten out his life.  He quickly failed to take advantage of it.  Ten days after the rape and sodomy charges against him were dismissed, Hammond put his apprenticeship with Antonio Stephney behind him and struck out on his own.  On the night of December 17, 1982, Hammond came upon a woman as she arrived at her apartment on Briarcliff Road in Atlanta.  Because this woman, named Trinh,[2] had worked the late shift, she did not get home until 1:30 a.m.  As she tried to get out of her car, Hammond loomed over her, stuck a knife to her neck, and forced her back into the car.  When she resisted, he beat her and slashed her hand with the knife.  He grabbed her purse and demanded her credit cards.  For the next hour Hammond terrorized Trinh.  He drove her around, telling her he was going to rape her and kill her and stuff her body in the trunk of her car.  She escaped with her life when Hammond had to pull the car into a service station to get some gas.  When he did that, Trinh jumped out of the car and ran to the attendant for help.  Hammond was quickly caught and charged.  He pleaded guilty to kidnapping with

---

[2] As we did with Janet, we use only Trinh's first name in order to protect her privacy.

bodily injury and armed robbery. He was sentenced to eight years in prison.

Prison life did not suit Hammond. He was taught some vocational skills in prison, but the main lesson he took from the experience was not a constructive one. Hammond vowed to his girlfriend that he would never let another of his victims live to send him back to prison. With each victim, he would come closer to fulfilling that vow.

In 1987 Hammond was released after serving less than half of his sentence for attacking Trinh. In May 1988 he saw a woman, whose name was Ellen,[3] entering her Rock Springs Circle apartment in Atlanta around lunch time. Hammond grabbed Ellen from behind, put her into a headlock and dragged her at knife point down two flights of stairs to her car. He rifled through Ellen's purse, found her bank cards, and drove her around the city forcing her to make withdrawals from several ATM machines. When Ellen had withdrawn the limit on her card, Hammond drove her to a trash-filled wooded area on a steep incline. There he raped her. Then he stabbed her repeatedly and slit her throat. Ellen had the presence of mind to fake convulsions so Hammond would think she was dying.

---

[3] As we did with Janet and Trinh, we use only Ellen's first name in order to protect her privacy.

After terrorizing and abusing her for three-and-a-half hours and seeing her convulse, Hammond hid Ellen's body under a blanket in the trash and left her for dead.

Thinking that he had succeeded in killing Ellen, Hammond bragged to his girlfriend, Janice Weldon, that he had killed a woman. He took her by the wooded area to show her where he had done it, and then he took her to see Ellen's car, which he had stolen. While looking into that car, Weldon noticed a Mother's Day card inside, all addressed and ready to be mailed.

After Hammond left Ellen, she pulled off the blanket, which he had intended to be her burial shroud, and she dragged herself from the wooded area to a street where she found help. We don't know when Hammond found out Ellen had survived. We do know that only two months after kidnapping, robbing, raping, and attempting to kill Ellen, Hammond abducted Julie Love. This time he was accompanied by his girlfriend Weldon and by his own apprentice, his 18-year-old cousin Maurice Porter.

As she lay on the floorboard of his car, Julie Love could not have known that Hammond's crimes against her were the latest in a series of his increasingly violent attacks on women. She could not have known about his vow to make sure that no

7

more of his victims would live to testify against him. She did know, however, that Hammond was cruel, violent, and dangerous. Love, who was only five feet tall and weighed just a hundred pounds, knew that because Hammond kept beating her. She was screaming.

After he finished beating Julie Love, Hammond wanted a cigarette. He told Weldon, who was driving, to take them to a service station in the Bankhead section of Atlanta so he could get something to smoke. Leaving Love in the back seat of the car with Porter, Hammond rested the shotgun against the front seat and went into the store. Weldon, Porter, and Love sat in the car in silence.

When Hammond returned to the Cutlass, he slid into the front seat next to Weldon and told her to drive the group to his grandmother's house in Northwest Atlanta. As they pulled up near the house and stopped, Hammond tossed Love's purse to Weldon and ordered her to go through it. Weldon rummaged through the purse, finding a little cash and some ATM cards. Hammond took the cards. He asked Love how much money she had in her bank account. She told him that she did not have much. Love begged Hammond not to hurt her.

She told him she kept cash at her apartment, and they could go get it. She also pleaded with him to call her boyfriend, who would give them anything they wanted if they would just not hurt her.

Worried that Love's boyfriend might be at the apartment, the group went to a pay phone where Weldon called Love's apartment. She got Love's answering machine. She heard Love's voice say: "Hi, This is Julie, and I can't come to the phone right now, but if you leave your name and number, I'll be glad to get in touch with you as soon as I can. Have a nice day, and thanks for calling." Satisfied that Love's boyfriend was not there, the group drove to the apartment complex. Once there, however, they saw a security kiosk out front and turned away.

The group doubled back to Northwest Atlanta. Hammond directed Weldon to drive to Grove Park Elementary School, which was just down the street from his grandmother's house. Standing on the steps of the school, his sawed-off shotgun in hand, Hammond forced Love to tell him the pin number for her ATM cards. She was so nervous she gave him the wrong number.

Holding Love at gunpoint at the school, Hammond sent Porter and Weldon to withdraw money using her ATM cards. Weldon drove Porter to a bank in the

West End area of town, where he punched the pin number Love had given into two different ATM machines. Because it was the wrong number, the machines gave no money and kept the cards. Realizing they would be returning empty-handed, Weldon (calling Hammond by his nickname) told Porter: "Demon going to be mad."

He was. When Porter and Weldon returned to the school with neither the cash nor the cards, Hammond became enraged. Standing over a seated Love, Hammond called her "bitch," hit her hard in the back with the shotgun barrel, and began beating her again. Because the beating "looked painful" to Porter and he no longer wanted to see it, he asked Hammond to "let [him] talk to [Love] for a minute." Hammond agreed.

The "talk" started out innocently enough. Porter took Love to the side and told her to "do nothing to make [Hammond] mad." Porter, however, had more than Love's best interests in mind. After advising her to avoid Hammond's temper, Porter proceeded to rape her. Love was, according to Weldon, "scared to death" and begged Porter "Please don't hurt me."

As Porter was raping Julie Love, Weldon and Hammond approached them. Weldon grinned at Porter, called him by his nickname, "Gooney," and told him he

was "a fool." Hammond told Porter to "come on" because "that was enough." Porter and Love pulled their clothes back on, and all four of them got back into the Cutlass. It was between 1 and 2 a.m. At that point Love had been at the group's mercy for more than three hours.

Sitting once again behind the wheel of the Cutlass, Weldon decided that she "didn't want to be involved" anymore. She asked Hammond to let her go home. Weldon's wanting out made Hammond "real angry," but because she was "getting on his nerves" he told Weldon to "go on." She drove the group to her apartment in College Park, on the south side of Atlanta. Hammond and Weldon got out of the car, leaving Porter alone with Julie Love. Standing in the doorway of the apartment, Hammond gave Love's purse to Weldon and told her to "get rid of it." She put the purse in a paper sack and threw it into a dumpster.

Leaving Weldon behind, Hammond, Porter, and Love continued their crisscross of the city. Hammond directed Porter, who was driving, to Hammond's mother's house in Cobb County. The three went inside where they found Hammond's mother standing in her kitchen reading a newspaper. Despite the late hour and the unknown white woman with her son and nephew, Hammond's mother barely acknowledged them when they greeted her. Hammond walked Porter and

11

Love back to his bedroom. For five minutes he left them sitting alone, apparently while he talked with his mother. When Hammond returned, the three of them left in the Cutlass.

Hammond ordered Porter to take them back to Grove Park Elementary. As they neared the school, he had Porter to turn onto a side street and cut the car off. Then Hammond got out and walked to the trunk, where he got three clothes hangers and a sheet. He unraveled the hangers and forced Love to lie on her stomach across the back seat of the sedan. Hammond then ordered her to put her feet together, and when she did he tied them with one of the unraveled coat hangers. Then he tied her hands together behind her back with another hanger. Face down and bound, Love lay on the rear seat while Hammond covered her head and body with the sheet. Then he wrapped the third hanger around her neck.

Hammond handed one end of the hanger to Porter and told him to pull. He did while Hammond pulled in the opposite direction. As the wire tightened around her neck, Julie Love struggled, kicked, screamed, and fought for her life. Small as she was, the fitness teacher managed to free her hands. As Hammond wrestled to get Love under control, she thrashed about and pleaded, "Don't do it." Calling her a bitch, he told her to "[s]hut up before I kill you right here."

12

Hammond's threat scared Love into submission long enough for him to rebind her hands with the coat hangers. As she lay there bound, Hammond sat and thought for awhile. Then he had Porter start the Cutlass and drive them to a wooded area off Grove Park Place, about two miles from the school. Once they were there, Hammond had Porter drive up and down the street several times. When he settled on a spot, Hammond ordered Porter to pull over and raise the car's hood.

Hammond removed the bindings from Love's feet, and then he marched her through trash-strewn bushes down into the woods. Three or four minutes later Porter got out of the car to lower the hood. He heard a gunshot. Porter hung his head for a moment, and when he looked up he saw Hammond coming up out of the woods alone. Hammond was holding the sawed-off shotgun and had blood spots on his face. Porter said: "You didn't do what I think you did." Hammond's only response was that he "had to."

At Hammond's direction, Porter drove back to Weldon's apartment on the south side. They arrived as the sun was coming up. Porter dropped onto the sofa and dozed off for a few hours. When he awoke, Hammond called him into a back bedroom where he was waiting with Weldon. Hammond made it clear that if either

one of them ever told anybody what he had done to Julie Love, he would kill them both. Then he described the murder. He told them that as he was about to shoot Love she raised her hands in front of her face, and he "blew her head off" with an "execution style" shotgun blast. The shot, he said, "blew the side of her face off." Hammond boasted, "You should have seen how I did it."

Shortly after Hammond killed Julie Love, Weldon told him her children needed "something to eat in the house." He gave Weldon a pair of small, diamond-and-gold earrings to pawn. Hammond described to Weldon how he had taken the earrings from Love while the two waited for Weldon and Porter to return from the bank. Love had begged him not to take them because they had belonged to her mother, who had died a few years before, and she cherished them. He took them from her anyway. Even so, Hammond told Weldon: "I didn't get a damn thing from the lady and I took her life."

Meanwhile, Julie Love's friends and family had no idea where she was. All they knew was that on July 11, 1988, she had met with a group of people for a career chat, as she did every Monday night. Then she disappeared.

Love and Mark Kaplan had become engaged on the Fourth of July, just a week before she went missing. Kaplan had last seen her earlier that day when he

kissed her as he left for work.  He called Love's apartment later that night,

expecting her to be back from her regular Monday meeting.  When he got her

answering machine Kaplan left a message.  He phoned Love again on each of the

next two days.  When he was unable to locate her after two days, Kaplan reported

her disappearance to the police, and an officer followed him back to Love's

apartment.  They could not get in.  The police were not yet willing to launch an

investigation into Love's disappearance, so Kaplan launched one himself.  After

calling her family and friends for help and information, Kaplan eventually

discovered the red Mustang Love had been driving.  It was on the road half a mile

from his home, jutting diagonally out from the curb, abandoned.  The formal police

investigation began when Kaplan showed police the abandoned car.

On Thursday morning, three days after Love's disappearance, an officer went

with Kaplan to her apartment so they could listen to her answering machine tape.

The tape was full of unplayed messages, starting with one Kaplan had left around

9:45 p.m. on the night Love had disappeared.  There were messages from him:

"Give me a call whenever you get home.  Just want to hear your voice. Okay?"

"You got me worried.  Whenever you get home tonight, give me a buzz."  There

were also messages from Love's family: "Hey, Doodle . . . it's Daddy again. . . . I'll

15

keep trying." And from her colleagues at work: "We were just wondering if . . . something had happened or what. . . . We'll be out on the playground. Give me a call at home if you need to." "I'm concerned because we haven't heard from you and we've been expecting you in the playroom at the sporting club." And from her friends: "Got me worried about you. Where are you, Julie? We haven't talked to you in two days." "Just call me sometime, let me know that you're alive and well, which I hope you are, and I'm sure you are, but let me hear from you." "Everybody's trying to find you. . . . So give me a call no matter what time you come in and call your Dad so he knows you're okay." In all, the tape held thirty-one messages from people worried because Julie Love had vanished.

After getting the police investigation started, Kaplan did more. He made flyers. He organized rallies. He opened his home to hundreds of volunteers who tried everything from "ask[ing] questions" to "comb[ing] the woods." He appealed "to anyone who knew anything to please come forward and share information that would help [him] find Julie." For more than a year no one did. During all of that time, none of the many people who cared for Julie Love knew that her body lay beneath some garbage in a northwest Atlanta trash pile. They might never have

16

known but for the fact that Hammond made the mistake of abusing his girlfriend, Janice Weldon, one time too many.

On a July night in 1989, a year after he had brutally murdered Julie Love, Hammond was choking Janice Weldon during an argument about some cocaine. When he finally loosened his grip on her neck, and as Weldon was gasping for air Hammond pointed his gun at her. She pleaded for her life. It was not the first time Hammond had done that sort of thing to Weldon, but it was to be the last. Although she was scared of Hammond, Weldon decided she'd had enough. She went to the police station and "took a warrant out on him" for the assault. Because Weldon was sure that Hammond would kill her for getting the warrant, she felt she had nothing to lose from telling the police about the murder of Julie Love. So she did.

In order to corroborate what Weldon had told them about Love's murder, investigators outfitted Weldon with a recording device and sent her to talk to Maurice Porter. What Porter said during that conversation, which he did not know was being recorded, corroborated Weldon's statements to the police. Porter and Hammond were arrested. Investigators questioned Porter, who admitted his participation in the crimes against Julie Love and identified Hammond as her killer.

17

Porter then took officers to the area where Love's body had been left more than a year before. The officers found her remains within thirty yards of where Porter had told them they would be.

In September 1989, Hammond and Porter were charged with murder, felony murder, kidnapping, and armed robbery. Porter was also charged with rape. He pleaded guilty. The State recommended that Porter receive three life sentences instead of a death sentence in exchange for his testimony at Hammond's trial in February and March 1990. Janice Weldon was given immunity in return for her testimony.

In addition to the eyewitness accounts provided by Porter and Weldon at trial, the State presented the testimony of Phillip Williams, who had been an inmate in the jail where Hammond was held on charges of assaulting Weldon. Williams testified that Hammond had offered him $20,000 and help establishing himself on the outside if he would kill Weldon. Hammond had told him that Weldon "knowed too much." Hammond also told Williams that he had killed someone. He gave Williams a piece of paper with his name and address written on it.

Janet, Trinh, and Ellen, three of Hammond's other victims, all testified about their encounters with Hammond. Each woman told of her hours-long ordeal of

18

being abducted, assaulted, and robbed.  Each woman's story foreshadowed what happened to Julie Love.  And each woman's account showed how Hammond's violence against women had been intensifying.

The State presented more evidence.  Michael Dominick testified that Hammond had sold him a sawed-off shotgun for "about $20"  and "around five rocks" of cocaine.  Dominick identified the shotgun shown to him by the prosecutor as the one he bought from Hammond;  he recognized a string he had tied to it after the purchase.  He testified that the gun had been in his possession from the time he bought it until it was confiscated by police during a drug bust.  Kelly Fite, a firearms examiner for the Georgia Bureau of Investigation's crime laboratory, testified that wadding found near Julie Love's remains had been discharged from a sawed-off twelve-gauge shotgun.

The State also presented the testimony of Dr. Randy Hanzlick, a medical examiner for Fulton County, who told of finding and analyzing some remains of Julie Love's body.  He described the area where most of the skeletal remains were found as a sloped bank that contained "an old broken television case" resting "part way up on a pile of tires."  On top of the broken television was a woman's blouse and bra with rib, shoulder, and back bones.  The blouse had held these upper-body

bones in roughly the "proper position," while other smaller bones had cascaded into the crevices of the tire pile below.

Just up the slope from the television, Dr. Hanzlick found fragments of Julie Love's skull. Smaller shards of it had trickled down through the tires. Altogether, he recovered twenty-two pieces of Love's skull, including one with dark "Caucasian head hair" attached to it. Nearby he found a glass eye with a brown iris. Love had brown hair, and she'd had a glass eye since she was a little girl. When Dr. Hanzlick glued the fragments of her skull together he saw a beveled semicircle-shaped hole, nearly an inch in diameter, in what had been Julie Love's head. Beneath the skull fragments, he found a pinkish disk of shotgun wadding with a diameter similar to the hole in the skull. Combining all of his findings, Dr. Hanzlick concluded that Love had died from a "gunshot wound to the head" that was "consistent with a closeup blast by a 12-gauge sawed-off shotgun."

"Demon" had told Porter and Weldon that he "blew the side of [Love's] face off" and had boasted that they should have seen how he did it. In a sense Dr. Hazelick did see that. He never found the bones that made up the right side of Julie Love's face.

**I.**

20

After a trial in February and March 1990, a Fulton County jury convicted Hammond of murder, kidnapping, and armed robbery. A two-day sentencing phase followed. On March 9, 1990, the jury found three aggravating circumstances: the murder of Julie Love was outrageously and wantonly vile; it had been committed during another capital felony (armed robbery); and Hammond had a prior armed robbery conviction. Hammond was sentenced to die. He appealed his conviction and sentence to the Georgia Supreme Court. Hammond v. State, 398 S.E.2d 168, 169 (Ga. 1990) (Hammond I). That court rejected all of Hammond's challenges, but it remanded the case to the trial court "to give [Hammond] an opportunity to litigate the issue of trial counsel's effectiveness." Id. at 175.

After conducting an extensive four-day hearing on Hammond's ineffective assistance claims, the trial court issued a sixty-seven page order explaining its decision not to vacate the convictions and sentences. State v. Hammond, Order Denying Mot. to Vacate Conviction and Sentence, Ga. Super. Ct. Fulton County, at 60, Mar. 4, 1994 (Hull, J.) ("Remand Order"). As the Georgia Supreme Court later summarized it, the trial court "concluded that Hammond's trial counsel rendered reasonably effective assistance throughout all phases of trial," and "that the evidence of Hammond's guilt was so overwhelming that any deficiencies in trial

counsel's performance did not affect the jury's decision in either phase of trial."

Hammond v. State, 452 S.E.2d 745, 754 (Ga. 1995) (Hammond II).  On return of

the case from remand, the Georgia Supreme Court agreed with the trial court that

Hammond's counsel had not rendered ineffective assistance either in the original

trial or on direct appeal.  Id. at 754.  The court also concluded that the evidence

supported Hammond's convictions and the death sentence fit the crime.  Id.  It

affirmed the trial court's judgment in its entirety.  Id.

Hammond filed a petition for a writ of habeas corpus in the Superior Court

of Butts County in December 1995.  He filed an amended petition a little more than

two years later and then a second amended petition in April 1999.  The state trial

court conducted an evidentiary hearing on that  second amended petition in

December 1999 and eventually denied it in November 2000.  Hammond v. Head,

Order Denying Second Amended Petition for Writ of Habeas Corpus, Ga. Super.

Ct. Butts County, at 3, Nov. 8, 2000 (Brannen, C.J.) ("State Habeas Order").

Hammond asked the Georgia Supreme Court for a certificate of probable cause to

appeal, but that court denied Hammond's application in May 2002.  Hammond

appealed to the United States Supreme Court, but his petition for a writ of certiorari

was denied in January 2003.

Hammond then filed his petition for federal habeas corpus in the United States District Court for the Northern District of Georgia in June 2003. In January 2004 he filed an amended petition that raised fifteen claims. In January 2008 the district court denied habeas relief because it concluded that the state courts' resolution of the claims he had presented to those courts was "neither contrary to nor an unreasonable application of clearly established federal law." Hammond v. Terry, No. 1:03-cv-1646, at 5–57, 80 (N.D. Ga. Jan. 4, 2008) (District Court Order). The district court also decided that Hammond was not entitled to habeas relief on any of the claims he raised that had not been decided on their merits by the state courts. Finally, the district court denied Hammond's requests for discovery and his request for an evidentiary hearing, which related to one of his prosecutorial misconduct claims.

Hammond filed a motion to alter or amend the judgment of the district court, which was denied in February 2008. The court did issue an order granting in part Hammond's motion for a certificate of appealability. That order gave Hammond permission to appeal on some of his claims. We later granted Hammond's motion to expand the COA to cover issues relating to his request for discovery and an evidentiary hearing on one of his Brady claims.

## II.

In <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." A <u>Brady</u> violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948 (1999). The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985) (internal quotation marks omitted); <u>see also</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565 (1995). We determine materiality by asking whether "the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." <u>Smith v. Sec'y, Dep't of Corr.</u>, 572 F.3d 1327, 1334 (11th Cir. 2009) (citing <u>Kyles</u>, 514 U.S. at 434, 436–37 n.10, 115 S. Ct. at 1566, 1567 n.10).

24

Under AEDPA, if the state court had addressed Hammond's <u>Brady</u> claims on the merits, we could not grant him relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>LeCroy v. Sec'y, Fla. Dep't of Corr.</u>, 421 F.3d 1237, 1259 (11th Cir. 2005).

Hammond raised his <u>Brady</u> claims in his state habeas petition in 2003. Those claims were based on evidence that Hammond asserted had previously been suppressed by the State, and so he argued that the claims were timely. The state habeas court did not disagree. It simply failed to address the claims as <u>Brady</u> claims, instead treating them as ineffective assistance claims. For that reason the district court reviewed the <u>Brady</u> claims <u>de novo</u>, without applying any deference under AEDPA. We do the same. <u>See, e.g.</u>, <u>Toles v. Gibson</u>, 269 F.3d 1167, 1172 (10th Cir. 2001) ("Under the AEDPA, the appropriate standard of review for a particular claim hinges on the treatment of that claim by the state courts. If a claim was not decided on the merits by the state courts . . . we may exercise our independent judgment in deciding the claim."); <u>DiBenedetto v. Hall</u>, 272 F.3d 1, 7

25

(1st Cir. 2001) ("Faced with state court opinions that do not decide constitutional claims raised by the defendant . . . federal courts apply de novo review to the federal constitutional claims raised in habeas petitions."). Hammond brings twelve Brady claims to us.

## III.

We begin with the six Brady claims that fail to reach the materiality stage of the analysis. See Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1337–42 (11th Cir. 2009) (following the same approach).

## A.

Hammond claims that the prosecution violated Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972), by eliciting misleading testimony from Janice Weldon about her criminal background.[4] Weldon testified that she had never been arrested or spent a single day in jail. Hammond contends that Weldon's statements were misleading because the State possessed evidence, mostly in the form of statements by Weldon herself, implicating her in several violent crimes including

---

[4] Claims arising under Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972), are a type of Brady claim that have a different and more defense-friendly measure of materiality. United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995). That difference does not figure into this case because, as we will soon see, the only Giglio claims Hammond raises do not make it to the materiality stage.

26

the Love murder, the Gwendale Turner murder, and the kidnapping of another woman.

A <u>Giglio</u> claim involves an aggravated type of <u>Brady</u> violation in which the suppression of evidence enabled the prosecutor to put before the jury what he knew was false or misleading testimony, <u>Ford v. Hall</u>, 546 F.3d 1326, 1332 (11th Cir. 2008), or allowed the prosecutor himself to make a false statement to the jury, <u>Alzate</u>, 47 F.3d at 1110. The testimony or statement elicited or made must have been a false one. <u>See</u> <u>Smith</u>, 572 F.3d at 1335 ("Accurate statements do not violate the <u>Giglio</u> rule."); <u>United States v. Meros</u>, 866 F.2d 1304, 1309 (11th Cir. 1989) ("Simply put, there has been no violation of <u>Giglio</u> in this case since [the witness'] testimony that he voluntarily turned himself in was true.").

Hammond concedes that Weldon's testimony about her criminal history was literally accurate. He admits that she had never been arrested, nor had she been in jail even for a single day. Georgia Bureau of Investigation (GBI) Agent Nita Weston corroborated that fact by testifying that she had been "unable to find any criminal history on Weldon." Because there was no lie, there was no <u>Giglio</u> violation.

**B.**

27

Hammond claims that the State failed to disclose its suspicions that Weldon had been involved in crimes against a woman named Ellen. In May 1988, just two months before Love was murdered, Ellen was abducted, robbed, raped, stabbed repeatedly, and left her for dead. See supra at 6–7. Ellen testified at Hammond's trial in this case and identified him as her attacker. Her testimony was admitted as similar-act evidence because the incident was so similar to Porter's and Weldon's accounts of what they and Hammond had done to Julie Love. Hammond's counsel wanted to impeach Weldon's credibility by showing that she had been the female accomplice in the crimes against Ellen. He complains that the State, which suspected that Weldon had been that accomplice, failed to disclose its suspicion to the defense.

It is unclear, however, what actual evidence Hammond contends should have been disclosed. He asserts that the police believed that Weldon was probably the female accomplice. Yet Hammond has cited no tangible evidence that was withheld that tended to show the accomplice was Weldon. He points to no evidence at all beyond what came out at his trial.

Weldon's story was that she learned of Ellen's kidnapping the next day, when Hammond told her about it. It came out, however, that Weldon knew the

details of the crime against Ellen, including the fact that her stolen and abandoned car had an unmailed Mother's Day card in it. (She said Hammond took her to the car and she looked inside it.) Ellen, who had every reason to know and none to lie, testified that there was a female accomplice. Weldon, who claimed to have been told about the crime by Hammond, did not mention one. Everyone, including the jury, knew that Weldon had been Hammond's girlfriend at the time. Finally, Weldon bore a striking physical resemblance to another woman whom Ellen had originally identified as Hammond's female accomplice.

The point is that of course the police suspected that Weldon had been Hammond's female accomplice in the crimes against Ellen. All of the reasons for their suspicions came out at trial. For those same reasons Hammond's trial counsel also suspected that Weldon had been the accomplice. He pursued that point before the jury. Counsel cross-examined Ellen about it, getting her to admit that she had mistakenly identified another woman as the accomplice. He then showed Ellen a picture of Weldon for comparison's sake. He thought about having Weldon brought into the courtroom so Ellen could look at her, but decided at the last minute not to do that.

So far as Hammond has been able to show, all the evidence to support his position that Weldon was the accomplice in the crimes against Ellen came out at trial. He points to the testimony of a police officer taken at a deposition eight years after the trial in which the officer stated that he had suspected Weldon. He also has a former prosecutor's affidavit of the same vintage indicating that he had strongly believed Weldon was involved in the crimes against Ellen and had considered prosecuting her for them. So far as we can tell, however, the officer's and former prosecutor's suspicions were based on the same evidence that underlay everyone else's suspicions, all of which came out at trial. That one officer or one prosecutor had suspicions is not admissible evidence any more than the fact that trial counsel himself had drawn those same suspicions. Nor has Hammond explained how disclosure of those suspicions would have led to the discovery of admissible evidence. There was no suppression of evidence.

Although we rest our decision about this Brady claim on the lack of suppression, we note that any thought of materiality brings to mind the awkwardness of this claim for Hammond. Weldon was his girlfriend. She and Porter testified that she was his accomplice in the abduction and robbery of Julie Love. If, as Hammond insists, his girlfriend Weldon was an accomplice in the

30

crimes committed against Ellen, that makes it more likely that Hammond was the man who committed those crimes. And anything that makes it more likely that Hammond committed the crimes against Ellen makes it more likely that he committed the strikingly similar crimes against Julie Love just two months later.

## C.

Hammond claims that the State withheld evidence about the amount of money it paid Weldon for her testimony. He adds that Weldon lied when she acknowledged only around $650 in cash payments from the GBI and Fulton County, and when she testified that the money was given to her so that she could relocate. Hammond asserts that the truth is that Weldon got at least 22 separate payments, mostly in cash, that totaled around $2,600. Hammond says that because his counsel did not have that information, he could not impeach Weldon with it. Hammond's trial counsel swore in a later affidavit that "I was never provided with information accurately detailing the payments made to Janice Weldon."

Hammond's claim is not supported by the record. At trial, during his cross examination of Weldon, Hammond's counsel said: "They spent $1,260 on you for food, did they not?" He also asked whether the GBI paid "$74.51 to have you moved?", whether "they spent $315 for your household expenses?", and whether

the GBI paid "for your lodging that totaled $429.70?". Weldon acknowledged that

she had been paid about $650, but disclaimed any knowledge of the amount that

the GBI had paid to have her moved or for her lodging. For those expenses, she

stated that the GBI "didn't pay me. They paid the hotel fee." Hammond's counsel

concluded his line of questions by asking:

> Q. So you got a total, did you not, Miss Weldon, of almost $2500 for your expenses while you were in the witness program, did you not?

> A. Just like I said, they didn't show me no papers about no 2,000 and whatever dollars you're talking about.

> Q. Well, you don't have any doubt that that's inaccurate, do you?

> A. Well, I'm sure they didn't pay that much, because my lawyer took over.

As the trial transcript shows, Hammond's counsel possessed detailed figures

about how much money had been spent to support Weldon. He knew her hotel bill

and moving expenses down to the pennies, and was aware of the rough total

amount of $2,500. He used that information to cross-examine Weldon. The trial

transcript shows there was disclosure; there was no suppression.

Because information about the payments to Weldon was not suppressed,

Hammond's related Giglio claim based on Weldon's alleged lies about the amount

of the payments to her also fails. Ford, 546 F.3d at 1331 ("Giglio error, a species of Brady error, occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.") (internal quotation marks omitted) (emphasis added).

**D.**

Hammond claims that the State suppressed evidence that it had bullied Phillip Williams into testifying against Hammond after Williams attempted to recant what he had said earlier. Williams testified at trial that he had been incarcerated in the Fulton County jail with Hammond. He told the jury that, after they had become friends, Hammond had offered him $20,000, a car, and assistance with getting a job on the outside if Williams, who was slated for release, would kill Weldon. Williams further testified that Hammond had shown him pictures of Weldon and had written down his address so that Williams could contact Hammond after they got out of jail. According to Williams, Hammond had said that Weldon needed to be killed "because she knowed too much." Williams explained that he had gone to the police with the information because he "just didn't want to see Janice [Weldon] get hurt, knowing she had kids and stuff" and

33

added that he believed Hammond would carry out his plan to have her killed. Williams testified that he did not expect anything in return for his testimony against Hammond, although he conceded that he had failed to respond to his subpoena and so had been arrested and held as a material witness for the trial.

Eight years after the trial, however, Williams signed an affidavit telling a much different story. In the 1998 affidavit Williams swore that "I had agreed to testify that Emanuel Hammond had offered me money to kill Janice Weldon. It wasn't true but at the time I had a very bad heroin addiction and I thought that if I agreed to testify I would get out of jail faster. . . ." Williams also claimed that he changed his mind and decided not to testify against Hammond, but the prosecutor had told him that if he refused to testify he would be falsely charged with other crimes and sent to prison. And if he agreed to testify, charges pending against him would be reduced or dropped. Williams said that he had been in heroin withdrawal and just wanted to get the whole thing over with so he could return to the street. The affidavit does not state that Williams told the prosecutor that his statements incriminating Hammond were false, only that he had changed his mind about testifying and then that the prosecutor had pressured him back into doing it.

After comparing Williams' testimony to his affidavit, the district court found that the affidavit was an after-the-fact fabrication and so refused to give it any weight. District Court Order, at 68–69. The court observed that Williams' 1998 allegations against the prosecutor were vague. It also noted that the prosecutor could not have agreed to drop any pending charges against Williams, as the affidavit claimed, because none were pending at that time. Moreover, Williams' trial testimony against Hammond was corroborated by the handwritten note containing Hammond's address that had been given to Williams and admitted into evidence at trial. In view of all the facts and circumstances, the district court made a factfinding that the story contained in Williams' affidavit was a lie.

We review the district court's factfindings only for clear error. United States v. Hogan, 986 F.2d 1364, 1371 (11th Cir. 1993). Hammond has not argued that the district court's finding that the prosecutor did not bully him into testifying was clear error, and we do not believe it was. As a result, this Brady claim has no factual basis. A prosecutor cannot be required to disclose that he bullied and threatened a witness when he did not.

**E.**

35

Hammond claims that the State suppressed evidence that Phillip Williams also had an extensive criminal record and a history of drug abuse. He argues that information about Williams' drug habit and prior convictions could have been used to impeach Williams' testimony.

Again, the record contradicts Hammond's claim. During Williams' cross-examination, Hammond 's trial counsel asked him:

Q. But you were in [jail] for possession of cocaine, weren't you?
A. Yes.
Q. And how often do you use cocaine?
*       *       *
A. Once, twice a week.
Q. And how long have you used it?
A. About two or three years.

Trial counsel also put into evidence certified copies of Williams' five prior convictions— two convictions for theft, each with a 12-month sentence; a conviction for theft with a 9-month sentence; a conviction for robbery with a 5-year sentence; and a drug conviction with a 2-year sentence. Hammond's trial counsel obviously had a lot of evidence of Williams' drug use and prior convictions, and Hammond has not specified what else, if anything, was suppressed.

## F.

Hammond claims that the State failed to disclose that it sent the sawed-off shotgun it alleged was the murder weapon for forensic comparison to the wadding found by Love's body. He offers an inventive conspiracy theory, which goes like this: the State surreptitiously removed the shotgun from the evidentiary exhibits after it had been marked as an exhibit; the State had the shotgun tested; the test revealed that it was not the same shotgun that had fired the wadding found by Love's body; the State then hid that result from the defense; and to make the cover-up complete, it secretly slipped the shotgun back into evidence. Thus, Hammond argues that the prosecutor lied when he told the jury that the shotgun was the murder weapon because the prosecutor allegedly knew about the alleged negative result of the alleged forensic test.

While this claim may be firmly moored in Hammond's imagination, it is unmoored from any evidence in the record. His Giglio claim that the prosecutor lied about the shotgun being the murder weapon requires him to demonstrate that the prosecutor knew the shotgun was not the murder weapon. Not only is there no evidence the prosecutor knew that fact, there is also no evidence it was a fact. And there is plenty of evidence the shotgun was in fact the murder weapon. Julie Love

was killed by a blast to the head that was "suggestive of a shotgun wound," and a shotgun wadding was found in the decaying matter close to the fragments of Julie Love's skull.[5] That wadding came not just from a 12-gauge shotgun, but from a sawed-off 12-gauge shotgun, precisely the same type of shotgun admitted into evidence. Michael Dominick testified that he had bought that sawed-off 12-gauge shotgun from Hammond, and he identified it by its missing trigger guard and by a string he had attached. Dominick added that Hammond had brought him the gun "about three or four weeks" before an August 1988 police raid. (Love had been

---

[5] The medical examiner testified:

Q. Dr. Hanzlick, in front of you I have placed state's exhibit number 68 and ask you if you can identify that.

\*     \*     \*

A. State's exhibit 68 is a pink, somewhat distorted shotgun wadding identical to the one that I removed from the ground the day that I examined the area around Julie Love's remains.

Q. Have you seen shotgun wadding before?

A. Yes, I have.

Q. Have you ever seen shotgun wadding in that condition?

A. I haven't seen one this particular color with these particular defects, no, but I've seen ones that in general are similar.

Q. But the only time you've seen one identical to this was at the crime scene?

A. Yes.

Q. And where was that found?

A. This was found in the soil or humus or decaying matter adjacent to the area where the skull was, skull fragments were located.

\*     \*     \*

A. It's just a piece of shotgun wadding I found that was in close proximity to the fragments of her skull that bore an injury suggestive of a shotgun wound.

38

killed in July of that same year.) Porter also identified the shotgun as the one that Hammond had used to murder Love. Hammond himself even acknowledged that he had seen the shotgun before, although he told the jury that it had belonged to Weldon, and that she, not he, had sold it to Dominick.

In the hope of countering all of that evidence, Hammond theorizes that a forensic test ruled out the shotgun as the murder weapon by finding that it did not fire the wadding found by Love's body. But despite vigorous attempts during the state habeas proceedings, Hammond failed to produce any evidence at all that the shotgun had ever been forensically tested. Forensic investigator Kelly Fite testified that "I see there's a gun on my report, but I don't recall the gun, actually." Nor did Fite have any recollection of doing any tests, or of what later happened to shotgun. Hammond has not shown that the prosecutor's assertion that the sawed-off shotgun was the murder weapon was a lie. Plenty of evidence supported the assertion that it was the murder weapon and no evidence indicates otherwise.

So all that remains of Hammond's Brady and Giglio claims about the shotgun is the assertion that the prosecution failed to notify him that it had temporarily removed the shotgun from the court for possible forensic testing. But even that assertion has no factual basis. Just hours after first locating the gun, the

39

prosecutor told the court: "[W]e found the gun yesterday afternoon, found this witness [Dominick] this morning at 10:30. It's not like we've been sitting on a murder weapon ever since the date of the crime, believe me. Your Honor, we also expect there will be evidence from the crime lab technician." The trial court refused to admit the shotgun into evidence at that time and ordered the prosecutor to put it away so the jury would not see it. Hammond's counsel was on notice that the shotgun had not been admitted into evidence and that the prosecutor planned to seek forensic testing to connect it to the wadding. The prosecutor did not, as Hammond asserts, "surreptitiously remov[e] the gun from the courtroom in the middle of the trial." Petitioner's Brief at 52. The shotgun had not at that point been admitted into evidence. It was still a State's exhibit. The prosecutor simply had it sent to the crime lab, after stating in open court that was what he was going to do.

The next week, the shotgun returned to the courtroom without any test results being mentioned.[6] The failure to mention any test results is the peg on which Hammond has hung his hat. He argues that the test results must have shown that the shotgun did not fire the wadding found by Love's body because

_____

[6] The court's concerns about admitting the shotgun into evidence were eventually resolved, perhaps by Hammond's own testimony admitting that he recognized the shotgun but that it belonged to Weldon. It was admitted into evidence.

otherwise the State would have introduced those test results into evidence. There is not a speck of evidence to show that there was a test indicating whether that sawed-off 12-gauge shotgun was the sawed-off 12-gauge shotgun that fired the wadding found with Love's body. Hammond has had an opportunity to find any evidence that there was a test, and what it showed, but he has come up with nothing.

Hammond argues that, if the shotgun was not in fact tested, the most likely explanation is that the ballistics expert, Kelly Fite, immediately saw that the wadding was not fired by the shotgun. Hammond could have, but did not, recall Fite to the stand at trial to explain why there were no test results.

Fite was asked about test results during the state habeas evidentiary hearing. He testified that although an intake form showed that the gun had come to his lab, there was no record that it had ever been tested. He said that one possible explanation is that a quick look showed the wadding could not have come from the shotgun. Another explanation, he said, is that no test was possible because the barrel was oxidized (rusted), a condition that prevents matching the striations in a barrel to a wadding. That explanation is by far the more likely one because just a few days before Fite received the gun, Dominick, who had bought it from Hammond, had testified that the barrel was in fact rusty:

41

Q. I want you to look down the barrel of this weapon, sir, if you will. Is it rusty?

A. Yes, sir.

There is a perfectly logical explanation in the record, which does not require us to assume a multi-agency conspiracy against Hammond, for the absence of any test results about the gun, negative or otherwise. It was too rusty to test. The record shows it was rusty.

There is no factual anchor for Hammond's <u>Brady</u> claim about the shotgun. His trial counsel knew that the shotgun would be sent for testing and knew that no test results came back. He actually argued that fact to the jury. In the 19 years since his conviction Hammond has not found a shred of evidence that any test was ever performed on the gun, nor has he offered any explanation for the lack of a test that is remotely as plausible as the rusted barrel preventing any useful test. There is no evidence at all that the prosecutor received exculpatory test results and hid them.

As a fallback request, Hammond seeks to have the shotgun tested now. He argues that the district court abused its discretion in refusing to order testing in view of the state habeas court's earlier refusal of his similar request. Hammond hopes that despite the poor condition of this sawed-off, 12-gauge shotgun with its

42

rusty barrel, there is some chance that a test could show that it is not the sawed-off, 12-gauge shotgun that was used to murder Julie Love.

Hammond's request to have the shotgun tested comes years too late. Whatever testing he wants done now he should have asked for at the time of the trial. He could at least have asked Fite at trial if any testing had been performed. The reason he did not pursue testing is telling. Hammond's primary strategy at trial was to portray Weldon and Porter as the murderers. Consistent with that strategy, he did not attempt to present any evidence that this shotgun was not the murder weapon. Instead, he took the position that it was the murder weapon but that it belonged to Weldon, who along with Porter had used it to kill Love. Hammond testified this shotgun was not his but he had seen it at Weldon's house before Love was murdered. He told the jury that the gun had belonged "to one of her ex-boyfriends or something; some dude she was going with had apparently left it there." Hammond also testified that at one time he had gone with Weldon to sell the shotgun and had not seen it since. To corroborate Hammond's story, his counsel called a man named Richard Cody, who testified that he had been present when Weldon, not Hammond, sold the shotgun to Dominick. Cody added that the

five rocks of crack cocaine that were given for the gun went to Weldon, not to Hammond.

Hammond's counsel followed up on his strategy of pinning the murder weapon on Weldon in his closing argument, when he told the jury: "[Y]ou heard Mr. Porter take the stand and say well, I remember that [shotgun] handle. Well, if he remembers the handle it's because he used it. And then you heard Mr. Cody take the stand and said yes, I was there; Miss Weldon sold this weapon and she's the one that received the crack cocaine and not Mr. Hammond." Counsel argued to the jury, in line with his general defense theory, that Weldon and Porter had committed the crime and had framed Hammond. Though he also noted in passing the lack of forensic testing, the defense argument that Weldon had owned and used the shotgun highlights the weakness of Hammond's belated position that it was not the murder weapon after all.

In keeping with his new position, and to strengthen his argument for testing the shotgun, Hammond's brief concedes that it was, after all, his: "[T]he truth in this case—that Appellant possessed a saw-off [sic] shotgun that was not the murder weapon—was virtually valueless to the prosecution." Petitioner's Brief at 53 (emphasis and internal quotation marks omitted). At trial Hammond swore it was

44

not his shotgun, now he insists it is. A defendant can change his positions, but he is not entitled to a post-trial fishing expedition to support his new position, which contradicts his own testimony at trial, especially when there is no reason to believe that what he belatedly seeks would be useful.

## IV.

The remainder of Hammond's Brady claims do reach the cumulative materiality stage. "[T]he analytical process of gauging materiality begins with determining the force and effect of each individual item of favorable evidence not disclosed to the defense." Smith, 572 F.3d at 1346; see also Kyles, 514 U.S. at 437 n.10, 115 S. Ct. at 1567 n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect . . . separately."); Maharaj v. Sec'y, Dep't of Corr., 432 F.3d 1292, 1310 (11th Cir. 2005) ("[T]he only way to evaluate the cumulative effect is to first examine each piece standing alone."). That means we size up each piece of evidence before aggregating it and considering the cumulative impact. We then weigh that cumulative impact against the inculpatory evidence presented at trial to decide whether our confidence in the guilty verdict is undermined. Smith, 572 F.3d at 1346–47; see also Kyles, 514 U.S. at 453, 115 S. Ct. at 1575 ("[T]he question is

. . . whether we can be confident that the jury's verdict would have been the same.").                              **A.**

Hammond claims that the State suppressed the audiotape of the prosecutor's pretrial interview with Weldon and Porter.  He argues that the tape would have been useful because during that interview Porter said that Weldon herself had removed Love's earrings, which contradicted Weldon's statement that Hammond had given them to her later.  Weldon's and Porter's statements remained inconsistent about the earrings.

In his 1998 affidavit, Hammond's trial counsel stated:  "Nor was I provided with the audiotape . . . of the joint interview between Mr. Porter and Ms. Weldon conducted by [the prosecutor]. . . . When I reviewed the State's file, there were no audiotapes or videotapes in the file."  The State has not responded to Hammond's allegation that the audiotape was not disclosed.  The tape qualifies as impeachment evidence and apparently was suppressed.  Accordingly, this claim reaches the materiality stage.

However, the "tendency and force," see Kyles, 514 U.S. at 437 n.10, 115 S. Ct. at 1567 n.10, of the statement about the earrings on the tape is not strong.  Had the tape been disclosed, it would have revealed that Porter and Weldon disagreed at

46

a pretrial meeting about who had removed Love's earrings.[7]  But that discrepancy is a detail.  It is unsurprising that two accomplices would not have the same recollection about all of the details of what happened during an hours-long crime involving kidnapping, rape, robbery, beatings, and murder.   The "tendency and force" of the earring discrepancy by itself is not strong, but it still must be considered cumulatively.

**B.**

Hammond claims that the State failed to disclose Christopher Fagin's account of what happened to Gwendale Turner, who was the man Weldon said in a tape-recorded interview Hammond had shot to death.  In an interview with police,

---

[7] To the extent that the tape would have shown also that Weldon, Porter, and the prosecutor all met together before the trial, the jury was already aware of that.  During her cross-examination, Weldon volunteered that she had met with Porter and the prosecutor:

A. . . . [T]hey got me and Mr. Porter together and we would refresh our remembry.
Q. You and Mr. Porter got together and you refreshed your memory?  Is that what you are telling the jury?
A. Yes.
Q. When did you do all this?
\*        \*        \*
Q.  Was it since you have reported this murder of Julie Love?
A. Yes.
\*        \*        \*
Q. And you and Mr. Porter got together, didn't you?
A. We didn't get together.  We was in the same room.
Q. And you all discussed it?
A. Yes.

Fagin had said that Weldon and Hammond had robbed Turner and shot him to death. During Hammond's state habeas action, his trial counsel stated in an affidavit that "Christopher Fagin's videotaped interview with law enforcement agents regarding the College Park (Gwendale Turner) homicide was also not made available to me." Hammond claims that had his counsel been armed with Fagin's accusation, he could have impeached Weldon generally and specifically about her efforts to minimize her criminal background. The State has not denied that the Fagin tape recording was suppressed.

The gist of Fagin's statement was that in August of 1988, he had been present when Weldon and Hammond hatched a plan to rob one of her Cobra Club customers (now believed to be Turner). Fagin had been at Weldon's house when Hammond and Turner arrived from the club. Hammond took Fagin into the next room and showed him a .38 pistol and a sawed-off shotgun. Then Hammond, Weldon, and Turner left in Hammond's car. Shortly thereafter, Fagin heard a gunshot and the car returned. Fagin then helped dump the body, get rid of Turner's car, and clean the blood out of Hammond's car.

Although Fagin's statement implicates Weldon, this is a weak Brady claim because Fagin's statement largely corroborates Weldon's own description of the

48

Turner murder, which the jury heard. Weldon's tape-recorded statement about the incident, which the defense played to the jury at Hammond's trial, was quite similar to Fagin's version of what happened. Weldon stated that she met a man (now believed to be Turner) at the club, where he flashed money and tried to pick her up. She described returning to her house, where Fagin was, then leaving her house with Hammond and Turner but without Fagin. She said that she was driving when Hammond, riding in the back, suddenly shot Turner with a sawed-off shotgun. She said that she then returned to the house and cleaned up her clothes. She explained that Fagin and Hammond had returned to the body to remove Turner's shirt, which had his name on it, and to take his money.

Hammond claims that Fagin's statement shows that Weldon lured Turner to his death and actively participated in his murder. In fact, that is also a fair characterization of Weldon's own statements: she lured Turner to his death at the hands of Hammond and participated in the murder as the driver. To the extent that Hammond's goal was to impeach Weldon by showing that she had been involved in violent crimes before, Fagin's statement hardly adds anything to Weldon's own admissions. Further, Fagin's statements also would have provided strong inculpatory evidence against Hammond. If they had been introduced at trial, those

statements would have corroborated Weldon's otherwise uncorroborated account of Hammond murdering Turner. Because the effect of Fagin's statements would have been as harmful as helpful to the defense, we have some question whether they can accurately be described as favorable. See Johnson v. Alabama, 256 F.3d 1156, 1189 (11th Cir. 2001) ("[T]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching . . .") (quoting Strickler, 527 U.S. at 281, 119 S. Ct. at 1948). Even assuming that they can be considered favorable to Hammond, the balance of the opposing effects of Fagin's statement is not much in Hammond's favor. The suppressed statements will have little "tendency and force" in undermining the State's case at the materiality stage. See Kyles, 514 U.S. at 437 n.10, 115 S. Ct. at 1567 n.10.

## C.

Hammond claims that the State failed to disclose that Weldon had been given broad immunity against prosecution for her crimes. He concedes that his trial counsel knew that Weldon had received immunity in the Love case, but argues that he had not been told that Weldon would not be prosecuted for her alleged role in the crimes against Ellen or for her admitted role in the Turner murder.

50

In support of this claim, Hammond presents an affidavit from Weldon's attorney affirming that: "It was [his] further understanding that [Weldon] would not be prosecuted in either DeKalb County or Fulton County for any other potential criminal charges arising from incidents about which she provided information to the State." Hammond's trial counsel stated that he was not aware "of the precise nature and scope of the immunity agreement" entered into by Weldon.

In response, the State asserts only that the suppressed immunity agreements covering the crimes against Ellen and Turner are not material. As to the "tendency and force" of Weldon's immunities, Kyles, 514 U.S. at 437 n.10, 115 S. Ct. at 1567 n.10, generally speaking if an important witness has received immunity, that is a significant fact. The Supreme Court has held that the government's failure to disclose that it had promised immunity to its most important witness is material and requires a new trial, at least where the case depends almost entirely on that witness' testimony. Giglio, 405 U.S. at 154–55, 92 S. Ct. at 766; see also Moore v. Kemp, 809 F.2d 702, 720 (11th Cir. 1987) (remanding the case to the district court for an evidentiary hearing to determine if the key government witness had been promised immunity).

However, it is not the case that every immunity agreement, or the scope of the immunity promised, is always material by itself.  See United States v. Burroughs, 830 F.2d 1574, 1579 (11th Cir. 1987) ("Materiality is a function of the strength of the government's case. . . . In Giglio, the weakness of the government's case played an important role in the Supreme Court's decision.").  Although Weldon was a key State witness, her testimony was supported by Porter's equally important testimony, along with that of Dominick and Williams, as well as physical evidence in the form of the body, the earrings, the bank cards, the shotgun, and the wadding.  Further, the jury knew of Weldon's immunity for the case at hand, in which she played a significant accomplice's role in a multi-hour kidnapping, beating, robbery, rape, and murder.  During his closing argument, the defense counsel stated:

> Now, [Weldon]'s gone in and said I want to tell you all this and the State says well, we're not going to prosecute you.  Why?  Wasn't she involved?  Wasn't she there?  By her own admission?  Didn't she sell the earrings?  Didn't she see Mr. Porter rape poor Julie Love[?] . . .

So, it was not just brought out to the jury, but also stressed, that Weldon had gained a great deal from her testimony against Hammond.

As for her immunity in the Turner and Ellen cases, Weldon's testimony about them was minimal.  She testified only briefly about the crimes against Ellen.

52

She did not testify at all about the Turner incident, which was brought up by the defense and never mentioned by the prosecution.[8]  Finally, there is no evidence that Weldon's immunity in the Turner and Ellen cases stemmed from her agreement to testify against Hammond in the Love case; it is just as likely that any immunity she received for those cases was negotiated in return for her telling the police what she knew about those crimes.

Central to this materiality question is the fact that the jury knew Weldon was receiving a get out of jail free card in exchange for testifying against Hammond in the Love case.  The jury knew that she had a powerful incentive to do the State's bidding and testify against Hammond.  See Alderman v. Zant, 22 F.3d 1541, 1554 (11th Cir. 1994) ("[T]he thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony."); Haber v. Wainwright, 756 F.2d 1520, 1524 n.8 (11th Cir. 1985) (noting that promises of leniency for a State's witness may create "a greater incentive for the witness to try

---

[8] The Turner murder was not a part of the prosecution's case against Hammond at all. Weldon had given an unsworn videotaped statement to police, which the defense later insisted on playing during the trial.  After the tape was played, the judge said: "Well, the only information that the jury has about [the Turner murder] is what they've learned from the videotape that you insisted be played to the jury.  Defense counsel: Yes, Your Honor.  Court: So I don't recollect the State introducing any evidence of testimony concerning that matter or mentioning it in opening statement at all."  The court then rejected defense counsel's request to offer further evidence related to the Turner murder; the court refused to allow the defense to deflect the focus of the trial onto a different, uncharged murder.

to make his testimony pleasing to the prosecutor") (citation omitted). Because of the strength of the case against Hammond, and because the jury already knew of Weldon's immunity for all the crimes against Julie Love, we cannot say that the fact she received immunity in the Turner case (about which she did not actually testify) and in Ellen's case (about which there are only suspicions, no direct evidence, that she was involved) weighs heavily in the materiality scale. It certainly is not material by itself. Of course, we will consider this evidence along with the other suppressed evidence at the cumulative materiality stage.

## D.

Hammond claims that the State failed to disclose the results of the GBI's forensic tests. Before the trial the GBI had tested the interior of Hammond's Cutlass for blood. The test result stated: "Examination of the interior of the car (item 17) and piece of upholstery (item 32) fails to reveal the presence of blood." According to Hammond, that evidence suggests Love was never in Hammond's car and that Turner was not murdered in the car as Weldon had claimed (on the tape that the defense played to the jury). The State does not dispute that the forensic report was suppressed and argues only that it is not material.

As to its "tendency and force," Kyles, 514 U.S. at 437 n.10, 115 S. Ct. at 1567 n.10, Porter testified that when Hammond threw Love into the back seat and beat her, he hit her only in the center of her back and used only the side of the barrel of his shotgun. Porter testified that there was no blood. Thus, a test result showing no blood on the upholstery of Hammond's car is consistent with Porter's testimony. The test result has little or no value as evidence for the defense.

As for Gwendale Turner, Weldon stated in her taped police interview that Hammond had taken the car to a carwash to get the blood out. And the car was not examined for a full year after the shooting. Beyond that, the Turner murder was not part of the State's evidence against Hammond. The only reason the Turner murder came up was that the defense chose to play the tape of Weldon's description of the killing. No one was on trial for killing Turner, and even if the forensic evidence tended to disprove Weldon's version of Turner's death, it was nothing more than impeachment evidence on a collateral matter. See generally Fed. R. Evid. 608 (forbidding impeachment by extrinsic evidence on collateral matters). Insofar as this evidence cast doubt on whether Hammond murdered Turner in the way Weldon described it in the tape recording, it would have done the defense little good in this case.

For these reasons, the suppressed evidence of the negative blood tests is not material by itself but will be considered at the cumulative materiality stage.

## E.

Hammond claims that the State failed to disclose evidence that a serial killer, James Richard Conner, had confessed to killing Julie Love and passed a polygraph examination about it.

Conner told the police that he and another man had kidnapped and killed a woman he believed was Julie Love. He claimed that they had shot Love with a .38 caliber pistol and then dumped her body into a stream bed on a county line near Lake Hartwell. Conner told police all of this in April 1989, and a search and excavation of the area where Conner said he had left the body turned up nothing.

The State does not dispute that Conner's confession was suppressed but instead argues that because the statements were demonstrably false, failing to disclose them did not violate Brady. Assuming otherwise, we evaluate the statement for materiality.

As to the "tendency and force" of Conner's confession, see Kyles, 514 U.S. at 437 n.10, 115 S. Ct. at 1567 n.10, it is obvious that Conner was wrong about having participated in the murder of Julie Love. He was completely wrong about

every important fact that he shared with police. Forensic analysis of Love's remains suggested that she was shot not with a .38 as Conner said, but instead with a shotgun, as Porter testified. Her body was dumped not in a stream bed on the county line near Lake Hartwell, as Conner said, but instead on a trash pile in a different part of Atlanta, where Porter led police. That Porter was able to take police to the body, and Conner was not, proves that Porter knew what he was talking about while Conner did not. As the district court properly found, "there is no credibility to Conner's story." District Court Order, at 73.

The bald assertion that someone else confessed to killing Love can be favorable to the defense. But a demonstrably false confession such as Conner's probably is not. Even assuming it is "favorable" for Brady purposes it is only barely so and is of negligible weight in the materiality scale. Cf. Smith, 572 F.3d at 1344 (finding that a police report "was favorable to [the petitioner], although barely . . . [and] evidence of it should be considered in the cumulative materiality analysis, even though it will not help [the petitioner] much").

**F.**

Hammond claims that the State failed to disclose evidence casting suspicion on Julie Love's boyfriend, Mark Kaplan. Hammond alleges that police knew that

57

Kaplan's alibi for the night of Love's disappearance was false, that he had been seen siphoning gas from Love's car, had been sexually involved with other women, had later discouraged investigative efforts, and had lied to police when he said that he and Love were engaged and that she often ran out of gas.

Although the State does not dispute that certain information along these lines was not disclosed, the district court correctly found that Hammond overstated it. District Court Order, at 74. The record, as cited by Hammond, does not support his allegation that Kaplan was not engaged to Love and that he was sexually involved with other women at the time. Nor does it show that he tried to subvert the police investigation into Love's disappearance. Nor does it show that he lied when he said that Love often ran out of gas; in fact, another friend of Love's told police that a neighbor had driven Love to the gas station twice before.

As for the gas siphoning, that allegation rests entirely on an anonymous tip phoned in to a television station a month after Love disappeared; it was evidently never substantiated by the police. For all the record shows, it could have been phoned in by one of Hammond's friends or family members. Anonymous tips are not admissible into evidence to prove the truth of the matter stated in the tip. See, e.g., Miles v. Burris, 54 F.3d 284, 288 (7th Cir. 1995) (holding that witness'

"testimony about the content of the anonymous tip was inadmissible hearsay"). As for Kaplan's alibi being "false," the truth is that the gym where Kaplan said he had been the night Julie Love disappeared simply did not have a record of his being there.

Assuming that all of these allegations of information about Kaplan are "favorable" to the defense in the Brady sense, they have little "tendency and force" to help the defense. See Kyles, 514 U.S. at 437 n.10, 115 S. Ct. at 1567 n.10. Some of the alleged information is not supported by the record cites that Hammond provides for it, some of it, like the anonymous tip, is not trustworthy in the least, and the rest of it does not amount to much. Overwhelming evidence connects Weldon and Porter, and through them Hammond, to the crime. And there is no evidence suggesting that Kaplan has any connection to Weldon or Porter. The alleged information about Kaplan is not entitled to much weight when we get to the cumulative materiality stage. See Smith, 572 F.3d at 1344.

## G.

Six Brady claims have reached the cumulative materiality stage. They are: (1) an inconsistency between Porter and Weldon's stories as to who removed Love's earrings; (2) Chris Fagin's statements implicating Weldon as a participant

in the murder of Gwendale Turner, although she already had implicated herself in it by her own taped statement, which the jury heard; (3) Weldon's receipt of immunity for the Ellen and Turner crimes, in addition to her immunity for the Love murder, which the jury knew about; (4) the forensic report that showed no blood in Hammond's car more than a year after the Love murder; (5) the demonstrably false confession of a serial killer; and (6) a collection of miscellaneous information that supposedly casts suspicion on Mark Kaplan.

Our task is to consider the aggregate effect of all of that undisclosed evidence and compare it to the inculpatory evidence presented at trial. Smith, 572 F.3d at 1347 (discussing balancing the weight of evidence favoring the prosecution with the new weight of evidence favoring the defense). In that manner we decide whether our confidence in the guilty verdict is undermined— whether there is a reasonable probability that, given the exculpatory or impeaching evidence, a jury would have acquitted Hammond. Id. (citing Kyles, 514 U.S. at 453, 115 S. Ct. at 1575). "Of course, the stronger the evidence of guilt to begin with, the more favorable to the defense the undisclosed evidence will have to be to create a reasonable probability that a jury would have acquitted had the evidence been disclosed." Smith, 572 F.3d at 1347.

The evidence against Hammond was powerful. At oral argument even Hammond's present counsel admitted that the evidence presented against him was "extraordinarily strong" and added that she did "not believe there is an attorney in Georgia who would say that that was a weak case of guilt." That is an understatement. We agree with the state trial court and the district court, both of which characterized the evidence against Hammond as "overwhelming." Hammond II, 452 S.E.2d at 748 (quoting the trial court); District Court Order at 76–77.

Weldon and Porter told appropriately congruent stories. Their stories checked out—the bank cards had been found where Porter said the bank machines swallowed them; Love's earrings were found through the pawn shop where Weldon said she had sold them. Both Weldon and Porter described Hammond as carrying a sawed-off shotgun that night, and Porter said it was the weapon Hammond used to kill Love; the wadding found by Love's body was fired from a sawed-off shotgun. Porter led police to the area where they found the body. They knew that Love had been shot in the head, execution style. It is undeniable that Porter and Weldon were involved in the crime, as they testified that they and Hammond were.

There was also plenty of additional, separate evidence that corroborated Porter's and Weldon's stories and pointed to Hammond as the ringleader. One surviving woman, Trinh, whose story was similar enough to Love's to be admissible against Hammond, told how he had kidnapped, assaulted, and robbed her. Hammond openly admitted that he had been involved in two different abductions of women and had gone to prison for one of them. Another woman, Ellen, testified that Hammond had robbed, raped, stabbed, and left for her dead in the same area where Love's body was later found and just two months before Love disappeared.

Michael Dominick testified that Hammond sold him a 12-gauge, sawed-off shotgun around the time of Love's disappearance; Porter identified that gun as the one Hammond had used to kill Love; and the wadding found with her body came from a 12-gauge, sawed-off shotgun. Phillip Williams also testified that Hammond, while in jail later for assaulting Weldon, tried to pay him to kill Weldon because she knew too much.

Against this mountain of inculpatory evidence, we weigh the cumulative impact of the undisclosed evidence favorable to the defense to decide whether our confidence in the guilty verdict is undermined. Smith, 572 F.3d at 1347. There are

three basic categories of that suppressed evidence: evidence impeaching Weldon, evidence of other perpetrators, and forensic evidence.  We will look at the impact of each category and then combine those impacts.

Weldon could have been impeached in some small measure by the inconsistency about how she came to have Julie Love's earrings, and the fact that she had received immunity beyond her serious crimes against Love, and possibly even by Fagin's statement about the Turner murder, which was not a part of the State's case against Hammond.  But that is not much impeachment in light of all the evidence and given all the corroboration of Weldon's damning testimony against Hammond.

Fagin's statement, and perhaps the immunity she received for her participation in other crimes, does show that Weldon is a criminal.  But that fact was glaringly apparent to anyone who sat through the trial.  Hammond's counsel presented testimony that Weldon, who was a stripper, had sold a sawed-off shotgun to a drug dealer for five rocks of crack cocaine.  Weldon herself admitted that she had known about the crimes against Ellen, which she and Hammond believed had been a murder, yet she had done nothing about it.  In a taped statement she admitted a role in the robbery and murder of Gwendale Turner; she told of luring

him into a robbery which led to his murder by Hammond. Weldon admitted that she had driven the car during the Love kidnapping, and for hours had served as one of Love's captors. She did nothing to help Love escape from what she knew was likely to be death at Hammond's hands. She admitted rifling through Love's purse, robbing her, and standing by while Porter raped her. She admitted that she sold Love's earrings. She admitted that she never would have turned in Hammond but for the realization that he was going to kill her too.

Everyone knew Weldon was bad. The jury knew she had participated in violent crimes before. The jury knew she had received immunity for the kidnapping, robbery, and murder of Julie Love. The jury knew she had been paid for her testimony. The additional details that would have been provided by the undisclosed evidence about the earrings, Fagin's statement concerning Weldon's role in the Turner murder, and the immunity she received for other crimes, for which no one had been charged, would have been raindrops in the waterfall of evil surrounding Weldon.

The second category of evidence—that which Hammond contends points to other people as Love's possible killers—consists of Conner's false confession and the miscellaneous information relating to Mark Kaplan. This evidence, if it can be

called that, has little or no weight to contribute to the aggregate consideration for the reasons we have already discussed. See supra at 62–65. Moreover, it is unconnected to any feasible defense theory. This case was a straightforward instance of two admitted accomplices in a heinous murder coming forward to confess their own involvement and turning State's evidence against the alleged principal murderer, all coupled with evidence corroborating their testimony. Given all that Weldon and Porter knew about the crime, including where Love's body had been left and where her earrings had been sold, Hammond's only feasible defense was that Porter and Weldon had committed the crime without his knowledge and had decided to frame him. The false confession by Conner and the miscellaneous information relating to Kaplan do not connect to that defense and therefore would not have supported it.

The third category of suppressed evidence involves the lack of blood in Hammond's car when it was examined more than a year after the Love and Turner murders. Though this is evidence and it does have some weight, its impact in this case is substantially undermined by the fact that Porter testified Love had not bled in the car and by the delay in the examination.

Against all of that evidence, we weigh the inculpatory evidence—the corroborated parts of Weldon's testimony, Porter's testimony, Williams' and Dominick's testimony, Hammond's previous similar acts, the sawed-off shotgun, and the sale of the earrings. Our confidence in the guilty verdict and the sentence of death against Hammond is intact. It has not been undermined. Therefore, the suppressed evidence is not cumulatively material. The district court correctly rejected Hammond's Brady claims.

## V.

Next, Hammond claims that the prosecutor made five improper remarks during the closing argument at the sentencing phase of his trial.[9] The Supreme Court has held that a death sentence can be rendered unconstitutional if the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986); Payne v. Tennessee, 501 U.S. 808, 825,

---

[9] Specifically, Hammond now complains about the prosecutor telling the jury: that Hammond "didn't even have the guts to face you during this part of the trial;" that he had shown no signs of religious conversion or remorse and had "violated the law of God. Thou shalt not kill. . . . An eye for an eye, a tooth for a tooth, a life for a life;"; that it would be unfair for Hammond "to be in prison for life and have the taxpayers house, feed, clothe him with the tax dollars of Julie Love's friends and family. . ."; that he had been a "predator [] out there on the streets roaming, looking for prey. Just like a vicious wild animal roams the jungle looking for a weaker specimen to pounce upon."; and that Love would rest easier in her grave if Hammond were executed.

111 S. Ct. 2597, 2608 (1991) (stating that the same due process standard of fundamental fairness exists at the sentencing phase of a capital trial); see also Romine v. Head, 253 F.3d 1349, 1366 (11th Cir. 2001) ("[H]abeas relief is due to be granted for improper prosecutorial argument at sentencing only where there has been a violation of due process, and that occurs if, but only if, the improper argument rendered the sentencing stage trial fundamentally unfair.").

That is what Hammond claims—his death sentence violated due process because some of the prosecutor's remarks during closing argument rendered the sentencing process fundamentally unfair. During the sentencing stage itself Hammond failed to object to all but one of those remarks;[10] his objection to that one remark was sustained and the court instructed the jury to disregard the remark, and it denied his motion for a mistrial. During his direct appeal Hammond did not raise an issue about that or any of the other prosecutorial remarks he now contends violated due process. The Georgia Supreme Court rejected all of the contentions that Hammond did raise on direct appeal. It did, however, remand the case for the trial court to address whether Hammond's counsel had rendered ineffective assistance of counsel, an issue raised by the Court itself. Hammond I, 398 S.E.2d

---

[10] The one of these prosecutorial remarks Hammond did object to at trial is the one about his failure to testify during the sentencing stage.

at 175. One Justice dissented from the remand on the ground that it was a waste of time. He explained: "The evidence of aggravation in this case was so strong, this appellant is so dangerous, his criminal history is so lengthy, and his crime was so monstrous that it is difficult to understand how the remote possibility of a defect in representation could have materially affected the outcome of the trial." Id. at 179 (Smith, J., dissenting).

On remand Hammond complained about a slew of the prosecutor's statements, but not as an independent due process claim. Instead, he raised those statements and his trial counsel's failure to object to them in the context of an ineffective assistance of counsel claim. As Hammond's new counsel understood, the remand was limited to whether trial counsel had rendered effective assistance. See Hammond II, 452 S.E.2d at 754 ("This case was remanded to the trial court solely to resolve the issue of ineffective assistance of counsel. Hammond correctly acknowledges that the additional issues he now wishes to raise may not be considered in this proceeding.") (internal citation omitted).

For that reason, when the trial court addressed the claim on remand, it decided it as an ineffective assistance of counsel claim. See Remand Order at 60 ("The Court finds that the brief 18 pages of closing argument by the prosecutor in

this case did not render the sentencing proceeding fundamentally unfair. In conclusion, [defense trial counsel] was not ineffective in any manner during the sentencing phase."). Reviewing that judgment, the Georgia Supreme Court handled the claim the same way, stating that although certain parts of the prosecutor's statement were improper, "after reviewing the entire sentencing phase of [the] trial, we conclude that these remarks neither changed the result of the sentencing trial nor rendered it fundamentally unfair. Therefore, Hammond has failed to establish ineffective assistance of trial counsel with regard to this claim." Hammond II, 452 S.E.2d at 753 (internal citations omitted).

In this federal habeas proceeding Hammond continued his ineffective assistance of counsel approach to attacking the prosecutor's sentencing stage remarks. The district court, however, held that the state courts' rejection of that ineffective assistance claim was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. See 28 U.S.C. § 2254(d)(1). In his appeal to us from the district court's judgment, however, Hammond has dropped his ineffective assistance claim about the failure to object to the remarks and instead claims that the prosecutor's remarks violated due process.

The problem for Hammond is that this due process claim is procedurally barred. See State Habeas Order at 4 ("Georgia law requires that errors or deficiencies in the trial be objected to at trial and pursued on appeal if possible or they will be deemed waived."). Hammond did not raise this claim as a due process claim at trial or on direct appeal. Ineffective assistance of counsel can be cause to excuse a procedural default. See Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986) ("Ineffective assistance of counsel, then, is cause for a procedural default."). But Hammond does not argue that to us. He does not argue that the Georgia courts unreasonably applied Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), when they held that his counsel did not render ineffective assistance by failing to object to the prosecutorial remarks, or by failing to raise the due process claim involving them on direct appeal. Hammond's straight-up due process claims are barred.

## VI.

Hammond claims that his Sixth Amendment right to counsel was violated by his trial counsel's constitutionally ineffective performance as measured under Strickland, 466 U.S. 668, 104 S. Ct. 2052. He argues that his trial counsel was ineffective for: (1) failing to investigate mental health evidence and present it as

70

mitigating circumstances; (2) introducing a videotape that suggested Hammond had committed a separate, uncharged murder; and (3) failing to move for a mistrial of the sentencing phase before the jury even though Hammond had a right to one under a Georgia statute because the prosecutor made an argument about parole eligibility.[11]

Under Strickland Hammond must make two showings.  First, he must show that his counsel's performance was deficient, which means that it "fell below an objective standard of reasonableness" and was "outside the wide range of professionally competent assistance."  Id. at 688, 690, 104 S. Ct. at 2064, 2066; see also Smith, 572 F.3d at 1349.  In deciding whether trial counsel performed deficiently, courts are to review his actions in a "highly deferential" manner and

_____

[11] Hammond also appears to argue that his trial counsel erroneously advised him not to accept a plea offer from the prosecution.  But Hammond offers no citation to any part of the record that supports this assertion.  See Fed. R. App. P. 28(a)(9)(A) (requiring "citations to the authorities and parts of the record on which the appellant relies").

Further, when Hammond made the plea offer argument to the Georgia Supreme Court in 1994, that court held that "[t]he record does not show that present counsel raised this issue below," and added that in any case, the claim was "based solely on conjecture," and counsel's behavior did not fall outside "the wide range of reasonable professional assistance."  Hammond II, 452 S.E.2d at 751.  Accordingly, this claim is procedurally barred because it was not raised in the trial court when that court was considering the ineffective assistance claims.  See Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." (citing Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S. Ct. 1038, 1044 n.10 (1989))).  Hammond has made no effort to explain to us why this procedural bar does not apply.  Indeed, he has hardly made any argument at all about his counsel's advice to him concerning an alleged plea offer.

71

"must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. To overcome Strickland's presumption of reasonableness, Hammond must show that "no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc); Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1209 (11th Cir. 2007) ("Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" (quoting Chandler)).[12]

Second, under Strickland Hammond must also show that, but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different—that is, our confidence in the outcome must be undermined by counsel's deficient performance. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. At least, that is the standard where the deficient

_____

[12] An industrious effort on behalf of his client on other fronts does not bar a claim that trial counsel rendered ineffective assistance in one or more specific ways. Jefferson v. Hall, 570 F.3d 1283, 1314 (11th Cir. 2009) (Carnes, J., dissenting) ("Adequate, or even stellar, performance in regard to one aspect of the trial does not bar a conclusion that counsel performed ineffectively in another regard."). Still, it is worth noting that even though the evidence was overwhelming that Hammond committed a horrific crime against an innocent young woman, this is not one of those cases where counsel failed to make much effort. He worked hard for his client. See Remand Order at 7–31 (cataloging and discussing counsel's pretrial effort and actions).

72

performance resulted in the impairment of some federal right.  See Part VI.D.3, below.

Under AEDPA, however, Hammond must do more than satisfy the Strickland standard.  See 28 U.S.C. § 2254(d).  Because the Georgia courts have already rejected these ineffective assistance claims, Hammond must show that their decision to deny relief on those claims was an objectively unreasonable application of the Strickland standard.  See Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); Bell v. Cone, 535 U.S. 685, 699, 122 S. Ct. 1843, 1852 (2002); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004) ("[T]he AEDPA adds another layer of deference . . . . [The petitioner] must also show that in rejecting his ineffective assistance of counsel claim the state court applied Strickland to the facts of his case in an objectively unreasonable manner.") (internal quotation marks and citation omitted).

**A.**

Hammond claims that his trial counsel was ineffective for failing to more diligently seek out mitigating evidence about his mental competency and intelligence. Although counsel hired a psychiatrist and psychologist to examine him, Hammond contends that was not enough. He argues that his counsel failed to have enough contact with those experts to get the best results from them. He insists that a more thorough mental health investigation would have resulted in findings that Hammond had a below-normal IQ, a history of drug use, and untreated ADHD. Another psychologist, retained by later counsel for Hammond, stated that Hammond's academic ability is at the third or fourth grade level and that at a young age he huffed gasoline and was "scarred" by a sexual experience with a prostitute. Hammond theorizes that if all of this information had been presented during his sentencing phase, it would have created a reasonable probability of a life sentence.

As Strickland made clear, whether counsel must seek out mental or emotional state mitigating evidence, and the lengths to which he must go in doing so, depends on the individual facts of each case. See Strickland, 466 U.S. at 673, 699, 104 S. Ct. at 2057, 2070 (finding it "well within the range of professionally

reasonable judgments" for a defense counsel not to request a psychiatric evaluation after speaking with the defendant). In a case like this one, where trial counsel did investigate the defendant's mental state, the deficiency question is whether his decision not to investigate it further was reasonable. See id. at 690–91, 104 S. Ct. at 2066; Jefferson v. Hall, 570 F.3d 1283, 1309 (11th Cir. 2009) (holding that "Jefferson's counsel were required only to make a reasonable decision that further investigation into Jefferson's mental health was unnecessary") (internal quotation marks omitted).

The Georgia trial court decided that Hammond's counsel was not deficient for failing to order additional mental health evaluations or for failing to present as mitigating circumstance evidence what his experts had found. Remand Order at 26–31, 31 ("If anything, the record affirmatively shows that Mr. Wehunt was effective trial counsel [on this issue]."). That decision was supported by a number of findings, including the fact that: (1) trial counsel "was successful in obtaining over $8,000 in court funds to retain not only a noted psychiatrist but also an accomplished forensic psychologist"; (2) Dr. Cheatham, the forensic psychologist, "interviewed defendant Hammond extensively, conducted a physical examination of [him], took blood and urine specimens . . . and had the specimens tested"; (3) Dr.

Sutton, the psychologist, met with Hammond twice, reviewed his school and medical records, and conducted comprehensive intelligence and neuropsychological tests on him; (4) Dr. Sutton found that Hammond was "at, or slightly below, average range of intelligence" with an IQ of 83; (5) Dr. Cheatham, in his own words, failed to find "any significant signs of mental disease or impairment," and Dr. Sutton found that Hammond was not psychotic, though he did have "some personality problems." Remand Order at 26–31.

Hammond has not even argued that clear and convincing evidence contradicts any of those state court factfindings, so they stand. 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); Fugate v. Head, 261 F.3d 1206, 1215 (11th Cir. 2001).

The Georgia Supreme Court affirmed the trial court's rejection of this ineffective assistance of counsel claim. It held both that the performance of Hammond's trial counsel in investigating mental health mitigating circumstances was not deficient and also that no prejudice resulted from his decisions. Hammond II, 452 S.E.2d at 751 ("[T]he prejudice prong of the Strickland v. Washington test

76

has not been satisfied . . . [and] we cannot conclude that the investigation by and tactical judgment of Hammond's attorney was outside the wide range of reasonably effective assistance.") (internal brackets and citation omitted).  We agree.

Hammond's mental health was investigated.  After examining him, two highly regarded experts, a psychiatrist and a psychologist, concluded that Hammond had an IQ of 83.  They found no significant signs of mental disease or impairment but instead only amorphous personality problems like impulsiveness and resentfulness of authority.  Hammond's counsel reasonably decided that those findings were not helpful and that it was not necessary to dig deeper.  About the reasonableness of counsel's decision, the state trial court noted "[i]t is arguable that on balance, Dr. Sutton's findings would have done more harm than good for defendant Hammond."  Remand Order at 29.  The Georgia courts reasonably applied Strickland when they held that Hammond's trial counsel was not deficient in this area.

**B.**

Hammond also claims that his trial counsel was ineffective for showing the jury a video of Weldon's police interview in which she incriminated herself and Hammond in the Gwendale Turner murder.  Hammond concedes  that counsel

made a strategic decision to show the video but contends that it was a foolish one. The state trial court viewed the decision as a reasonable strategic one, stating that "[t]he playing of the Weldon tape was trial strategy, not ineffective assistance of counsel." Remand Order at 41. The Georgia Supreme Court agreed, rejecting this claim with the explanation that it was "not the duty of the courts to second-guess trial counsel's choice of strategy." Hammond II, 452 S.E.2d at 750; see also Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.

Hammond's counsel showed the video because he wanted to impeach Weldon. He wanted to show that she took the business of murder lightly and would happily make unsubstantiated accusations against Hammond. He wanted to show that Weldon would blame Hammond for anything. And counsel had done his legwork: he had investigated the Turner murder himself and had found photos of the victim contradicting Weldon's account. Tr. at 428 ("[Counsel]: I want [the State] to introduce the photograph, Judge, because that photograph clearly indicates that the man was shot from the front . . . . Your Honor, I'm ready. I knew what was in the tape. I've seen the pictures. I've done all my homework and . . . I think this witness has pretty well impeached herself. . . .").[13]

---

[13] Hammond also argues that his trial counsel incompetently handled the video tape in part because he referred to the victim Turner as "Fanulanu or whatever his name was." In fact, "FNU-LNU" stands for "first name unknown, last name unknown." We do not see how that

78

After playing the tape, counsel requested and received a limiting instruction from the judge, who charged the jury that the tape was to be considered for impeachment purposes only. Counsel repeatedly confirmed that he had conferred with Hammond about playing the tape.[14] The court asked Hammond if he "concur[red] with the strategy and tactics . . . of [his] attorney in playing the tape for the benefit of the jury," and Hammond answered that he did. Tr. at 432–33.

Counsel's strategy was to show a lengthy tape of Weldon in which she discussed the Love murder somewhat inconsistently with her testimony, and at the end, glibly accused Hammond of a completely different, entirely unsubstantiated murder—one in which photos tended to contradict her account. Counsel had prepared for the State's inevitable attempt to corroborate Weldon's statements. Either way the trial court ruled, it would further his strategy.

---

makes any difference. The remark was made when no one was using Turner's name because no one was sure who the victim was. It appears that counsel had researched possible murders and murder victims that Weldon may have been referring to on the tape and found no bodies that matched her description of that killing. The body that the prosecution believed was the right one—that of Turner, apparently—had been shot in the front, not in the back of the head, contrary to Weldon's story.

[14] Tr. at 426 ("Court: Did you discuss with Mr. Hammond the utilization of this? [Counsel]: Yes, sir."); Tr. at 427 ("Court: Well, my question is, did you discuss with Mr. Hammond, your client, the playing of this? [Counsel]: I discussed it with him, Judge, but he had never seen the tape."); Tr. at 432 ("Court: All right. Did you discuss the contents of the tape with your client before playing the tape? [Counsel]: No, Your Honor. I gave him a summary of the contents. I told him that I intended to use it for the purposes of impeachment.").

If, on the one hand, the trial court allowed the State to corroborate Weldon's story, counsel could rebut that with photographs that proved Turner had been shot in the front—not in the back of the head as Weldon claimed. The ensuing dispute would draw the jury's attention away from the Love murder and toward this other case for which no one was on trial and for which the State had much weaker evidence against Hammond. If, on the other hand, the court refused to allow the State to corroborate Weldon's story, her statement would be left floating without any corroboration and with the jury instructed to consider it only for purposes of impeaching her testimony against Hammond. The court chose the "on the other hand" course, and for all the jury knew, there was nothing to support Weldon's story that there even was a dead victim in that other case.

The strategy was bold but Hammond's counsel had done his homework, he got his limiting instruction, and he had the support and permission of his client. Those factors bolster the Georgia Supreme Court's rejection of this ineffective assistance claim. See Strickland, 466 U.S. at 690, 104 S. Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."); see also Lobosco v. Thomas, 928 F.2d 1054, 1057 (11th Cir. 1991) (holding that, largely because the defendant concurred

in the strategy, it was not ineffective assistance under <u>Strickland</u> for defense counsel to use his closing argument at the guilt stage of the trial to concede the defendant's guilt and begin building a case for mercy based on his contrition); <u>United States v. Weaver</u>, 882 F.2d 1128, 1140 (7th Cir. 1989) ("Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel [under <u>Strickland</u>]."); <u>United States v. Williams</u>, 631 F.2d 198, 204 (3d Cir. 1980) (no ineffective assistance existed because the defendant ultimately concurred in his trial counsel's tactical decision). Hammond has failed to convince us that the Georgia Supreme Court's decision on this ineffective assistance of counsel claim was unreasonable within the meaning of § 2254(d)(1).

## C.

Finally, Hammond claims that his counsel rendered ineffective assistance by failing to move for a mistrial when, during his closing argument at the sentencing phase of the trial, the prosecutor said: "[The defense counsel is] going to tell you to give the defendant life in prison so that he may be rehabilitated. I urge you, ladies and gentlemen, to reject that. There is no life without parole in Georgia. So one day he will be a free man. One day—". Before the prosecutor could say anything more, defense counsel interrupted with an objection, stating that the prosecutor "has no evidence to that effect and it's improper and I move to instruct the jury that, to strike it." The court granted that relief, stating to the jury: "Well, I will instruct the jury that the comment made by the district attorney with respect to what may or may not happen upon the imposition of a sentence by the jury of life imprisonment is improper, incorrect. You will please disregard his comments in that regard."

Under Georgia law at the time, if he had not been sentenced to death Hammond would have been eligible for parole in either 5 or 20 years, and therefore could have been released at age 29 or 44, depending on whether the sentences

imposed for his crimes were made to run concurrently or consecutively.[15]

---

[15] Hammond was found guilty of murder, kidnapping, and armed robbery. He was convicted and sentenced to life imprisonment for the robbery and death for the murder. He was sentenced to 20 years on the kidnapping conviction. These crimes were committed on July 11, 1988, so the provisions of the Georgia Code in effect at that time control. Hahn v. State, 303 S.E.2d 299, 301 (Ga. Ct. App. 1983) (holding that "the only statute under which appellants could be constitutionally sentenced . . . was that which was in effect at the time the crime was actually committed").

If Hammond had received two concurrent life sentences, instead of the death sentence, section 42-9-45 of the Georgia Code would have applied. Prior to its amendment in 1994, that section provided in relevant part:

> An inmate serving a felony sentence or felony sentences shall only be eligible for consideration for parole after the expiration of nine months of his sentence or one-third of the time of the sentences, whichever is greater. Inmates serving sentences aggregating 21 years or more shall become eligible for consideration for parole upon completion of the service of seven years.

Ga. Code Ann. § 42-9-45(b) (1988), amended by 1994 Ga. Laws 1959, § 15 (1994).

This provision purportedly requires defendants serving sentences of 21 years or more, which includes life sentences, to serve 7 years before becoming eligible for parole. See id. In Charron v. State Board of Pardons & Paroles, 319 S.E.2d 453 (Ga. 1984), however, the Georgia Supreme Court construed § 42-9-45(b) as precatory rather than mandatory, thus avoiding its invalidation on state constitutional grounds. Id. at 455. Thus, Hammond would not have been required by statute to serve any particular duration of two concurrent sentences (or one life sentence) before becoming eligible for parole. Indeed, we have noted that "between 1983 and 1991, the Board, to alleviate prison overcrowding, chose not to comply fully with § 42-9-45(b)." Jones v. Ga. State Bd. of Pardons & Paroles, 59 F.3d 1145, 1147 (11th Cir. 1995). Under the Georgia Constitution, however, Hammond would have had to serve 5 years of his armed robbery sentence before becoming eligible for parole. See Ga. Const. art. IV, § II, ¶ II(b), amended by 1994 Ga. Laws 2015 (1994) ("When a person is convicted of armed robbery, the board shall not have the authority to consider such person for pardon or parole until such person has served at least five years in the penitentiary."). Thus, if Hammond had received concurrent life sentences for the armed robbery and murder, he would have been required to serve 5 years. Based on his age (24) at the time of the trial, he would have been 29 years old when he became eligible for parole. The same is true if he had just received one life sentence.

The result would have been different if Hammond had received two consecutive life sentences. In that scenario, section 42-9-39 of the Georgia Code would have applied. That

Even though Hammond would have been eligible for parole if the jury had not

sentenced him to death, the action of the judge in sustaining the objection and

giving a curative instruction was correct under state law.

Georgia law not only forbade any argument based on parole eligibility, it

provided the defendant with the option for a mistrial if such an argument was

made:

> (a) No attorney at law in a criminal case shall argue to . . . the jury that a
> defendant, if convicted, may not be required to suffer the full penalty

---

section imposes restrictions on the parole eligibility of defendants receiving certain life sentences. Subsection (c) governs when a defendant receives consecutive life sentences and one of the life sentences is imposed for the crime of murder. In 1988, section 42-9-39(c) provided:

> When a person receives consecutive life sentences as the result of offenses occurring in the same series of acts and any one of the life sentences is imposed for the crime of murder, such person shall serve consecutive ten-year periods for each such sentence, up to a maximum of 30 years, before being eligible for parole consideration.

Ga. Code Ann. § 42-9-39(c) (1988), amended by 2006 Ga. Laws 379, § 27 (2006).

This provision did not face the same constitutional limitations as § 42-9-45(b) because the Georgia Constitution empowered the General Assembly to "prescribe the terms and conditions for the board's granting a pardon or parole to . . . [a]ny person who has received consecutive life sentences as the result of offenses occurring during the same series of acts." Ga. Const. art. IV, § II, ¶ II(c) (emphasis added). Thus, if Hammond had received consecutive life sentences for the armed robbery and murder, he would have been required to serve 10 years for each life sentence, making him eligible for parole in 20 years—when he was 44 years old. See also Davis v. State, 340 S.E.2d 869, 884 (Ga. 1986) (noting that defendant receiving consecutive life sentences for murder and armed robbery would have to serve 20 years before being eligible for parole under the pre-amendment version of § 42-9-39(c)).

84

imposed by the court or jury because pardon, parole, or clemency of any
nature may be granted . . . .

(b) [If such argument is made] opposing counsel shall have the right
immediately to request the court to declare a mistrial, in which case it shall
be mandatory upon the court to declare a mistrial. Failure to declare a
mistrial shall constitute reversible error.

O.C.G.A. § 17-8-76. When asked later why he did not ask for a mistrial
Hammond's counsel stated that he was "afraid that [he] just let it slip by." He said
that "I was not aware at that particular time of the code section that you have
reference to." Remand Order at 57 (quoting counsel).

Counsel did, however, become aware of § 17-8-76 before the time for filing
a motion for a new trial expired. He read the relevant case law, he talked to other
attorneys about it, and he made a conscious strategic decision not to file a motion
seeking a new trial of the sentencing stage. See Remand Order at 58–59 (quoting
counsel: "So as a result of that and after hours and hours of deliberation over it, I
finally took it up on direct appeal and did not file a motion for a new trial."). It is
probably just as well that counsel did not file a motion for new trial because
Georgia law appears to preclude granting a new trial on § 17-8-76 grounds after the
sentencing phase is over. See Greene v. State, 469 S.E.2d 129, 139 (Ga. 1996),

85

rev'd on other grounds, 519 U.S. 145, 117 S. Ct. 578 (1996); Phillips v. State, 338 S.E.2d 57, 58–59 (Ga. App. 1985).

Counsel raised the prosecutor's parole eligibility argument on direct appeal. The Georgia Supreme Court agreed that the prosecutor's remark about parole eligibility was improper under O.C.G.A. § 17-8-76(a), but it held that the trial court was not required to grant a mistrial on its own motion and did not err in giving the curative instruction Hammond had requested instead. Hammond I, 398 S.E.2d at 175 ("Our Code does not require that a mistrial be declared even without a request, and the trial court did not err by granting only the relief [a curative instruction] sought by the defendant . . . .").

## 1.

What all of this boils down to is the question of whether it was ineffective assistance of counsel for Hammond's counsel not to assert his state statutory right to a mistrial of the sentence proceeding at the time of the prosecutor's parole comment, a time before the sentence verdict was known. Because the state trial court and the state supreme court rejected this ineffective assistance of counsel claim on different grounds, we must first decide whether we defer under §

2254(d)(1) to the state trial court decision, the state supreme court decision, or both.

The trial court on collateral review held that counsel's failure to move for a mistrial was not deficient performance and, given that, it decided not to address the prejudice element. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

The Georgia Supreme Court resolved the issue by coming at it from the other direction. It held that Hammond had failed to show prejudice and, given that, it decided not to address the performance element. Hammond II, 452 S.E.2d at 749 ("We need not decide whether in failing to move for a mistrial trial counsel's performance was deficient, because we conclude that this error did not undermine the reliability of the result of the sentencing trial."); see Strickland 466 U.S. at 697, 104 S. Ct. at 2069 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). In deciding the prejudice issue against Hammond, the Georgia Supreme Court acknowledged that a request for a mistrial would have led to a different jury determining his sentence, but it concluded that "Hammond

87

has not met his burden of showing that had a motion for mistrial been made 'the [sentencing] decision reached would reasonably likely have been different.'" Hammond II, 452 S.E.2d at 750 (quoting Strickland). In explaining that conclusion, the court pointed to the overwhelming evidence of guilt and of aggravating circumstances as well as the fact that "the trial court instructed the jury that the prosecutor's statement was incorrect, improper, and should be disregarded." Id. at 749–50.

Hammond takes the position that by skipping to the prejudice element, the Georgia Supreme Court rejected the trial court's holding that Hammond had failed to establish the performance deficiency element. If that were so, the only decision meriting any deference under § 2254(d)(1) would be the Georgia Supreme Court's decision on the prejudice issue and we would address the performance issue de novo. But it is not so.

The Georgia Supreme Court did not express any disapproval of the trial court's decision on the deficient performance element. Recognizing that, Hammond argues that a state appellate court decision on one element of the ineffective assistance issue automatically erases the trial court's decision on the other element. He cites no authority for that proposition, and there are decisions

88

that guide us away from it. In <u>Wiggins v. Smith</u>, 539 U.S. 510, 123 S. Ct. 2527 (2003), the state trial court and state court of appeals both rejected a petitioner's <u>Strickland</u> claim on the deficiency element. Neither court discussed the prejudice element. The Supreme Court found that the state courts' decision on the deficiency element was an unreasonable application of <u>Strickland</u>. <u>Id.</u> at 527, 123 S. Ct. at 2538. The Court then turned to the prejudice element and stated: "In assessing prejudice . . . our review is not circumscribed by a state court conclusion with respect to prejudice, as <u>neither</u> of the state courts below reached this prong of the <u>Strickland</u> analysis." <u>Id.</u> at 534, 123 S. Ct. at 2542 (emphasis added). The implication from <u>Wiggins</u> is that had <u>either</u> of the state courts reached the other prong, its decision would have been entitled to deference under § 2254(d)(1). <u>See also</u> <u>Cone v. Bell</u>, __ U.S. __, 129 S. Ct. 1769, 1784 (2009) (noting that the reason AEDPA deference was not due is that "the Tennessee courts" did not reach the merits of the claim); <u>cf.</u> <u>Hannon v. Sec'y, Dep't of Corrs.</u>, 562 F.3d 1146, 1150 (11th Cir. 2009) (noting that AEDPA's deference to the factfindings of state courts "applies to fact findings made by both state trial courts and state appellate courts").

There is also the fact the Strickland opinion itself actually urges courts to decide ineffective assistance claims on the prejudice element if that is easier. The Supreme Court said: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. The Supreme Court of Georgia quoted that directive from Strickland in its opinion. See Hammond II, 452 S.E.2d at 750 n.1. Under the circumstances, all we can infer from the Georgia Supreme Court's decision to resolve this ineffective assistance claim on the prejudice element is that it believed that was the easier route. We cannot conclude that it disagreed with or meant to discredit the different route the trial court took to the same destination.

Section 2254(d) speaks of deference to the "decision" that resulted from "the adjudication of the claim." The adjudication of this claim in the Georgia courts resulted in a decision that Hammond had not been denied effective assistance of counsel. Two reasons were given by the Georgia courts, one at each level of review. In deciding to give deference to both decisions, the critical fact to us is that the Georgia Supreme Court does not appear to have disagreed with the trial court's decision on the deficiency element. The court could have easily expressed its

90

disagreement, if any, but it did not do so. Or it could have cautioned that its decision was not to be read as implicitly agreeing with the trial court, but it did not do so. Cf. State v. Spence, 347 S.E.2d 612, 615 (Ga. App. 1986) ("Finally, our decision in the present case should not be interpreted as . . . ."); Allied Products Co. v. Green, 334 S.E.2d 389, 390 (Ga. App. 1985) ("Our decision in these cases is in no way to be interpreted as . . . ."); Berman v. Rubin, 227 S.E.2d 802, 806 (Ga. App. 1976) ("Our decision should not be read to state or imply that . . . ."). The Georgia courts, considered collectively, gave two consistent reasons for deciding against this claim. Each reason is due deference.

This conclusion is consistent with, indeed required by, the implicit holding of our recent decision in Windom v. Secretary, Department of Corrections, 578 F.3d 1227 (11th Cir. 2009). In that case the Georgia trial court rejected an ineffective assistance of counsel claim for lack of prejudice. Id. at 1249–50. The Georgia Supreme Court affirmed, but it did so on performance grounds without reaching the prejudice issue. Id. at 1249 n.12. In that mixed-ruling circumstance, we granted AEDPA deference to the state trial court's prejudice holding, even though the Georgia Supreme Court did not reach it. Id. at 1249–51. We now make explicit the implicit holding in Windom: where a state trial court rejects a claim on

91

one prong of the ineffective assistance of counsel test and the state supreme court, without disapproving that holding, affirms on the other prong, both of those state court decisions are due AEDPA deference. Unless both reasons for rejecting the claim are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), the ineffective assistance of counsel claim is due to be rejected.

**2.**

We turn now to the deficient performance element of this ineffective assistance claim. Hammond's trial counsel promptly objected to the prosecutor's parole remark. He persuaded the judge to tell the jury that it was improper and incorrect and to instruct them to disregard it. Counsel did not ask for an automatic mistrial, to which he would have been entitled under O.C.G.A. § 17-8-76. He did not know at the time that state law entitled him to a mistrial on request. Our issue is whether the Georgia trial court's determination that the failure of Hammond's counsel to request a mistrial of the sentencing phase was not "outside the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, is contrary to or an unreasonable application of Strickland.

Because the ineffective assistance of counsel standard is an objective one, a petitioner must establish that "no competent counsel would have taken the action that his counsel did take." Chandler, 218 F.3d at 1315. Under the law of this circuit the question is not why Hammond's counsel failed to move for a mistrial because of the parole remark but whether a competent attorney reasonably could have decided not to move for one. Id. at 1314–16. If an attorney could have reasonably decided not to abort the sentencing phase at the point the prosecutor mentioned parole, it does not matter if the actual reason trial counsel did not move for a mistrial was inattention, misguided tactics, or unawareness of the code section. See McClain v. Hall, 552 F.3d 1245, 1253 (11th Cir. 2008) ("[I]t matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight. The relevant question is not what actually motivated counsel, but what reasonably could have motivated counsel.") (internal quotation marks omitted); Chandler, 218 F.3d at 1316 n.16 (approving of Harich v. Dugger, 844 F.2d 1464, 1470–71 (11th Cir. 1988) (en banc), and citing it as "concluding—without evidentiary hearing on whether counsel's strategy arose from his ignorance of law—that trial counsel's performance was competent

because hypothetical competent counsel reasonably could have taken action at trial identical to actual trial counsel.").[16]

It follows that, under our circuit law, if a fully informed attorney reasonably could have decided to object to the parole remark and ask for a curative instruction but not move for a mistrial, Hammond has failed to establish the deficient performance element. And that is so even without the deference we owe the Georgia courts' decision rejecting this claim. See generally Schriro, 550 U.S. at 473, 127 S. Ct. at 1939 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

---

[16] Our analysis is not affected by the fact that trial counsel asked for a mistrial in response to two other remarks the prosecutor had made earlier in his closing argument at the sentencing stage. Hammond does not contend that asking for a mistrial on those two other occasions amounted to ineffective assistance, and we have no occasion to address that question. His claim is only that failing to request a mistrial because of the parole remark was ineffective assistance. To the extent that Hammond argues the two instances in which his counsel did seek a mistrial show that the failure to seek one in this instance was not strategic, that argument assumes that we should apply a subjective standard. Under the objective standard set out in our Chandler decision, the question is not why this counsel failed to ask for a mistrial after the parole remark, but whether an attorney could have reasonably decided not to ask for one then. To the extent Hammond argues that his counsel's request for a mistrial in those other two instances demonstrates it was deficient performance for him not to ask for one after the parole remark, we disagree. It might just as well be said that asking for the mistrial on those two other occasions was deficient performance, while not doing so after the parole remark was effective assistance. And, of course, it is not objectively unreasonable for an attorney to change his mind or tactics during the course of a trial, or during a closing argument for that matter.

94

Viewing the matter objectively, an attorney could have reasonably decided to object and get a curative instruction without invoking the drastic option of a mistrial. There are a number of reasons an attorney could have been leery of a mistrial. First, the racial composition of the jury was favorable to Hammond, a black man accused of murdering a white woman. After five days of extensive voir dire of hundreds of potential jurors about their feelings toward race and toward the death penalty, Hammond's counsel had managed to have a jury selected that consisted of eight blacks and four whites. An attorney reasonably could have considered the jury composition favorable and not wanted to risk losing it in a do-over.

Second, the chance of benefitting from residual doubt would be reduced with a new jury. See Jefferson, 570 F.3d at 1305 (discussing residual doubt as a strategy); Hannon, 562 F.3d at 1154 ("We have noted in our circuit that this lingering doubt or residual doubt theory is very effective in some cases."); Parker v. Sec'y, Dep't of Corrs., 331 F.3d 764, 787–88 (11th Cir. 2003) ("Creating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but is perhaps the most effective strategy to employ at sentencing.") (internal marks and citation omitted). If a mistrial had been declared, the new jury

95

would be instructed that Hammond had been found guilty and then would be immersed in the horrible details of the crimes he had committed.[17]  A reasonable attorney could consider reducing the prospects of benefitting from any residual doubt a significant negative.[18]

Third, an attorney could have reasonably believed that a new sentence hearing some months in the future would open up to reconsideration some

---

[17]A defendant in Georgia does have the opportunity to offer evidence relating to guilt or innocence at a retrial of the sentencing phase.  See Alderman v. State, 327 S.E.2d 168, 173 (Ga. 1985).  That does not mean, however, that a new jury would be as sensitive to any lingering doubts about guilt as the jury that had the heavy responsibility for determining guilt in the first instance.  The new jurors would be instructed that the defendant had already been found guilty by an earlier one and that their own responsibility was to set the punishment.  An attorney reasonably could believe that in those circumstances jurors would be less open to a residual doubt argument than the jurors that had actually gone through the process of deciding whether the defendant was guilty to begin with.  In addition, an attorney reasonably could be concerned that any prosecution witnesses he recalled for cross-examination before the new jury at a sentencing retrial might do better the second time around, having been through what amounts to a dress rehearsal for responding to counsel's cross-examination.

[18] The state trial court pointed out that a criminal defense attorney specializing in death penalty cases, who was called as an expert by Hammond, testified that when it comes to mitigating circumstances evidence, "residual doubt is probably the biggest mitigation there is." Remand Order at 59 n.5.

At sentencing Hammond's trial counsel did argue residual doubt to the jury, not exclusively but forcefully.  See, e.g., Sentencing Transcript Vol. V at 280 (closing argument at sentence stage) ("But [the prosecutor] wants you to think that he's sitting here with all this evidence.  Where is it?  Where is it?  That's what he wants you to believe."); id. at 281 ("But [the prosecutor] wants you to convict this man and say how vicious he is, because he came into this court and said I am not guilty of murder.  I did not kill anyone.  And I haven't killed anyone."); id. at 285 ("And anything he's been involved with, there may have been some violent acts, but there was an absence of one thing, and that was a death.  But there was not an absence of death with Maurice Porter, was there?  Maurice Porter and Janet Weldon are the two that was behind this entire act, but they want this man to pay for it.").

evidentiary rulings that had been made in Hammond's favor. Trial counsel succeeded in keeping out evidence of some crimes Hammond had committed as a juvenile in 1978, 1979, and 1983. He had also managed to prevent Christopher Fagin from being called to testify about Hammond's involvement in the Gwendale Turner murder. As the state trial court found in the remand proceeding, trial counsel had "limited significantly what prior crimes the State was allowed to introduce in the sentencing phase." An attorney reasonably could worry that given months to prepare for a second sentencing phase, the State might be able to persuade the trial court to admit more of the other crimes evidence, or might unearth witnesses to still more crimes Hammond had committed.

Finally, a reasonable attorney would take into account the promptness of the objection to the prosecutor's parole remark and the equally prompt and clear curative instruction. The Supreme Court and this Court have often held that we must presume that juries follow their instructions to disregard specific remarks. E.g., CSX Transp., Inc. v. Hensley, __ U.S. __, 129 S. Ct. 2139, 2141 (2009) ("The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions. Jurors routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death

97

matters. In those cases, as in all cases, juries are presumed to follow the court's instructions."); Greer v. Miller, 483 U.S. 756, 767 n.8, 107 S. Ct. 3102, 3109 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence . . . ."); United States v. Stone, 9 F.3d 934, 938 (11th Cir. 1993) (collecting cases). By the same token, attorneys reasonably can rely on that presumption. An attorney reasonably could proceed on the premise that the jury would disregard the prosecutor's parole remark, which it was told was "improper, incorrect" and was specifically instructed to disregard.

In sum, regardless of the actual reason Hammond's trial counsel did not request a mistrial based on the parole remark, an attorney in his position reasonably could have decided not to ask for one for good and adequate reasons. Therefore, not asking for a mistrial was objectively within "the wide range of professionally competent assistance," Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, because it could be justified by a reasonable strategy. See Chandler, 218 F.3d at 1315 ("[F]or a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."); McClain, 552 F.3d at 1253 ("Even if [defendant's] counsel in fact had no strategic reason for not further investigating [defendant's] history of drug abuse, counsel

98

could have reasonably concluded that further investigation would not yield valuable evidence . . . . ").  Accordingly, the Georgia trial court reasonably applied Strickland in denying Hammond's ineffective assistance of counsel claim because he did not establish that the failure to request a mistrial was "outside the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.  Alternatively, even if no deference were due the state court decision on the performance element, we would still conclude that Hammond had failed to establish it.

**3.**

Having found that this ineffective assistance of counsel claim fails on the performance element, we could stop here.  In the interest of completeness, however, we will address the State's alternative argument that the claim also fails on the prejudice element.  As we have mentioned, the Georgia Supreme Court decided it did fail for that reason.  Hammond II, 452 S.E.2d at 749.

This is not your ordinary prejudice issue.  It is an ineffective assistance prejudice issue different in kind from those that the Supreme Court and this Court have decided in the quarter century since Strickland was decided.  All of those decisions that we have been able to find involve asserted errors of counsel that the

99

defendant claimed deprived him of some advantage or protection that the Constitution or constitutionally protected values entitled him to have. That is not what we have here. This is a case in which the asserted error involved a state statutory right that not only does not protect or advance constitutional values or interests but also is in tension with them.[19]

---

[19] We asked the attorneys to file supplemental briefs on whether any decision had addressed this peculiar prejudice issue. The only controlling authority Hammond's present counsel pointed to is Roe v. Flores-Ortega, 528 U.S. 470, 120 S. Ct. 1029 (2000). That decision is not, however, one in which the Court applied Strickland to the failure to assert a pure state law right that did not further any federal constitutional principles or interests. Instead, Flores-Ortega involved counsel's alleged failure to consult with the defendant about his right to appeal the conviction. The Court expressly held that "counsel has a constitutionally imposed duty to consult with the defendant about an appeal" when there is reason to believe the defendant would want to appeal or the defendant has demonstrated an interest in appealing. Id. at 480, 120 S. Ct. at 1036. In those circumstances, a failure to consult deprives the defendant of his federal constitutional right to be consulted about whether he should file a direct appeal. In its discussion of prejudice, the Flores-Ortega Court analogized a direct appeal to a critical stage of the trial proceeding. Id. at 483, 120 S. Ct. at 1038. The Court did not suggest that a direct appeal, or consultation about whether to take one, does not serve to protect federal constitutional principles or values. We believe that it does.

Although Hammond's present counsel have not argued it to us, we have also considered Glover v. United States, 531 U.S. 198, 121 S. Ct. 696 (2001), which held that attorney error resulting in a sentence that was between 6 and 21 months higher than it should have been under the (then) mandatory federal sentencing guidelines range constituted prejudice. Glover is distinguishable from the present case because it involved the failure to assert a federal right, a failure that implicated the constitutional right not to be subject to a higher sentence than the law allows. (The top of the guidelines range after adjustments and departures was the equivalent of a statutory maximum in the pre-Booker era.). See Ivy v. State, 731 So. 2d 601, 603 (Miss. 1999) (sentence exceeding statutory maximum is error affecting fundamental constitutional rights); Crotts v. State, 795 So. 2d 1020, 1021 (Fla. 2d DCA 2001) (sentencing error violates substantive due process). See generally Bozza v. United States, 330 U.S. 160, 166, 67 S. Ct. 645, 648–49 (1947) ("It is well established that a sentence which does not comply with the letter of the criminal statute which authorizes it is so erroneous that it may be set aside on appeal, or in habeas corpus proceedings.") (citations omitted); cf. United States v. Bownes, 405 F.3d 634, 637 (7th Cir. 2005) (due process prohibits waiver of the right to appeal a sentence in excess of the

100

The Georgia statute, enacted in 1957, forbids any argument that a defendant might not serve his full sentence because he could be paroled (or pardoned). O.C.G.A. § 17-8-76(a); see generally Davis v. State, 340 S.E.2d 869, 884–85 (Ga. 1986). It applies to capital as well as non-capital cases. See § 17-8-76(a). The Supreme Court has never suggested that making a parole eligibility argument to a capital sentencing jury is unconstitutional or impedes federal constitutional values. Instead, a trilogy of Supreme Court decisions makes clear that it is constitutionally permissible to inform a jury that unless it sentences a capital defendant to death he will be eligible for parole. The import of those decisions goes beyond that. The Court's reasoning in them indicates that the Georgia statute, while permissible, not only does nothing to further federal constitutional values in the capital sentencing area but also is in some tension with them.

Simmons v. South Carolina, 512 U.S. 154, 114 S. Ct. 2187 (1994), involved a death sentence imposed on a defendant who, because of prior convictions for violent crimes, would not have been eligible for parole if the jury had sentenced him to life imprisonment. See id. at 156, 120 S. Ct. at 2190; see also Shafer v.

statutory maximum); United States v. Bushert, 997 F.2d 1343, 1351 n.18 (11th Cir. 1993) ("It is both axiomatic and jurisdictional that a court of the United States may not impose a penalty for a crime beyond that which is authorized by statute."). The Glover case did not involve the failure to enforce a state law right that was in some tension with federal constitutional rights and interests.

South Carolina, 532 U.S. 36, 48, 121 S. Ct. 1263, 1271 (2001).  The Supreme

Court held in Simmons that capital defendants have a federal due process right to

have the sentencing jury informed of their ineligibility for parole, at least where the

prosecution argues future dangerousness as a basis for a death sentence.  Simmons,

512 U.S. at 162–66, 171, 120 S. Ct. at 2193–95, 2198 (plurality opinion of

Blackmun, J., joined by Stevens, Souter, and Ginsburg, JJ.); id. at 176–78, 120 S.

Ct. at 2200–01 (concurring opinion of O'Connor, J., joined by Rehnquist, C.J., and

Kennedy, J.).

By the time of the decision in Shafer v. South Carolina, that state had

enacted a new capital sentencing scheme, 532 U.S. at 46 n.3, 121 S. Ct. at 1270

n.3.  As revised, South Carolina law provided that the only sentencing options

where the jury found a statutory aggravating circumstance were death or life

imprisonment without parole.  Id. at 41, 46 n.3, 121 S. Ct. at 1267, 1270 n.3.  Even

though the judge instructed the jury that "life imprisonment means until the death

of the defendant," he refused to instruct the jury, or allow defense counsel to

inform it,  that the defendant could not be paroled from a life sentence.  Id. at 45,

121 S. Ct. at 1269.  Instead, the judge instructed the jury that "[p]arole eligibility or

ineligibility is not for your consideration."  Id.  The Supreme Court held that

102

Simmons applied so that "whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole." Id. at 51, 121 S. Ct. at 1273. Because of the failure to provide the jury with accurate information about the impossibility of parole, the death sentence was reversed. Id. at 55, 121 S. Ct. at 1275. The final case in the trilogy is Kelly v. South Carolina, 534 U.S. 246, 122 S. Ct. 726 (2002), which extended the Simmons rule to cases in which future dangerousness is implied by the evidence and accentuated by the prosecutor even if he does not explicitly argue it.

The Supreme Court did not run the rule in the Simmons trilogy in both directions, but it did allow the states to do so. The Court said that in a state where a life-sentenced capital defendant is eligible for parole, nothing in the Constitution requires that the jury be informed of that eligibility. At the same time, the Court noted, nothing in the Constitution prevents the prosecution or judge from informing the jury about parole eligibility either. Simmons, 512 U.S. at 168, 120 S. Ct. at 2196 (plurality opinion); id. at 176 (concurring opinion of O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J.) ("In a State in which parole is

available, the Constitution does not require (or preclude) jury consideration of that fact.").

For present purposes, what is significant is the reasoning behind the Simmons rule that due process requires a capital sentencing jury be informed of parole ineligibility where there is evidence of future dangerousness. In reaching that conclusion the Supreme Court recognized that "a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system," Simmons, 512 U.S. at 162, 114 S. Ct. at 2193 (plurality opinion), and it has a special importance in capital sentencing decisions where it is "indisputably relevant." Id. at 163, 114 S. Ct. at 2194. Indeed, the Court reasoned that "it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not." Id. Viewed from the other direction, "there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he will never be released on parole." Id. at 163–64, 114 S. Ct. at 2194. That is why the Court was convinced that, for the jury, parole information is "so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury." Id. at 164, 114 S. Ct. at 2194.

The Court explained that unless informed by the attorneys or the court, jurors lack information about parole laws and "there is a reasonable likelihood of juror confusion about the meaning of the term 'life imprisonment.'" Id. at 169–70 & n.9, 114 S. Ct. at 2197 & n.9; id. at 169, 114 S. Ct. at 2197 ("It can hardly be questioned that most juries lack accurate information about the precise meaning of 'life imprisonment' as defined by the States."); id. at 177–78, 114 S. Ct. at 2201 (concurring opinion of O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J.) ("[C]ommon sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole."). A jury that is given a life sentence option but not told about what it means will be left "to speculate whether 'life imprisonment' means life without parole or something else." Id. at 166, 114 S. Ct. at 2195 (plurality opinion). Failing to inform the jury about whether the defendant will be eligible for parole could lead it to "a false choice" and a "grievous misperception." Id. at 161–62, 114 S. Ct. at 2193. That is why concealing information about whether a life-sentenced defendant will be eligible for parole can amount to misleading the jury. Id. at 166 n.5, 114 S. Ct. at 2195 n.5.

Two members of the Court went beyond the due process holding in Simmons to explain why the Eighth Amendment required the same result. Id. at 172–74, 114

S. Ct. at 2198–99 (concurring opinion of Souter, J., joined by Stevens, J.). They pointed out that a capital sentencing jury is called upon to make "a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed." Id. at 172, 114 S. Ct. at 2198. That "requires provision of accurate sentencing information as an indispensable prerequisite to a reasoned determination of whether a defendant should live or die." Id. (internal marks and brackets omitted). That same "need for heightened reliability" requires that the jury be instructed on the terms used to describe the sentences it must consider in making "the reasoned moral choice between sentencing alternatives." Id.

To similar effect is California v. Ramos, 463 U.S. 992, 103 S Ct. 3446 (1983), which upheld an instruction informing the jury that the governor had the authority to commute a sentence of life without parole to one of parole eligibility. The Court reasoned that without such information the jury might be misled; the instruction "corrects a misconception and supplies the jury with accurate information for its deliberation in selecting an appropriate sentence." Id. at 1009, 103 S. Ct. at 3458.

The point of our discussion is not that the Georgia parole concealment statute, O.C.G.A. § 17-8-76, is unconstitutional. It most definitely is not. See

106

Simmons, 512 U.S. at 168, 120 S. Ct. at 2196 (plurality opinion); id. at 176–77 (concurring opinion of O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J.); see also Ramos, 463 U.S. at 1013–14 & n.30, 103 S. Ct. at 3460 & n.30.  The point is that the statute does not further the federal constitutional interests identified in the Simmons trilogy, or any others for that matter.  Instead, its purpose and effect to some extent run counter to those federal constitutional interests and impede them, albeit in a way and to an extent that is not constitutionally forbidden.

As the Georgia Supreme Court has explained, the purpose of the statute is to conceal from the sentencing jury the fact that if it sentences the defendant to life, he will be parole eligible.  Davis, 340 S.E.2d at 884.  It is intended to and does have that purpose and effect even in cases, like this one, where the evidence focuses on the defendant's future dangerousness and the prosecutor stresses that factor throughout his closing argument.[20]  The statute operates to prevent the jury from even knowing about, much less taking into account, an "indisputably relevant" fact that is "crucial to its sentencing determination," Simmons, 512 U.S.

---

[20] See, e.g., Tr. at 261 ("[H]e is too big a risk to be let back out into society."); Tr. at 262–63 ("The death sentence . . . takes the life of a murderer to prevent other murders."); Tr. at 265 ("[B]ased upon everything you have seen and heard, the defendant is a threat to society."); Tr. at 268 ("[T]he death sentence uses evil to prevent a greater evil.  It takes the life of the murderer to prevent further murders.  He is a menace to society."); Tr. at 270 ("Just look at his crimes.  What do you think will happen to him this time?  Can we afford to take that risk?").

at 163–64, 114 S. Ct. at 2194 (plurality opinion).  Despite the fact that "it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not," id. at 163, 114 S. Ct. at 2194, the Georgia statute effectively mandates that the jury view them the same.  Because most jurors do not know what "life imprisonment" means, the statute leaves them to speculate, it causes confusion, and it may lead to a "false choice" and a misperception tainting their capital sentencing decision, id. at 161–66.  To be sure, the taint is in favor of the defendant but it is a taint nonetheless.

The Georgia statute hobbles a capital sentencing jury in its attempt to make "a reasoned moral judgment" between life and death.  Id. at 172–74, 114 S. Ct. at 2198–99 (concurring opinion of Souter, J., joined by Stevens, J.).  It works against the heightened reliability required for capital sentencing, and by virtually ensuring that there will be "a reasonable likelihood of juror confusion about the meaning of the term 'life imprisonment,'" Simmons, 512 U.S. at 169–70 & n.9, 114 S. Ct. at 2197 & n.9 (plurality opinion), which is one of the most crucial facts relevant to the sentencing decision, the statute can lead to sentences that are "arbitrarily or discriminatorily and wantonly and freakishly imposed," id. at 173, 114 S. Ct. at

108

2198 (concurring opinion of Souter, J., joined by Stevens, J.) (internal marks, ellipsis, and citations omitted).  We have come a long way since Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726 (1972), and the decisions that came in its immediate wake.  But we have not come so far that we can forget that arbitrariness and caprice are to be avoided in capital sentencing.  Ignorance of crucial facts that inform the sentencing decision promotes arbitrary and capricious sentencing.  We must keep that principle in mind when deciding whether it was contrary to or an unreasonable application of Supreme Court law under § 2254(d)(1) for the Georgia Supreme Court to decide that the failure of Hammond's counsel to take every available step to enforce the Georgia parole concealment statute does not undermine confidence in the outcome of the sentence proceeding.

In affirming the denial of state collateral relief on this ineffective assistance claim, the Georgia Supreme Court decided that Hammond had not shown the requisite prejudice from his counsel's failure to demand a mistrial because of the prosecutor's parole remark.  Hammond II, 452 S.E.2d at 749–50.  The court reasoned that while a motion for a mistrial would have resulted in another jury deciding Hammond's sentence, there was no reason to believe that a new jury would have reached a different result.  Id.  It pointed out that "[t]he evidence

against Hammond, offered both during the guilt/innocence phase and in aggravation during the sentencing phase, was overwhelming" and that the trial judge had instructed the jury to disregard the prosecutor's remark about parole. Id. at 749. The court concluded that "Hammond has not met his burden of showing that had a motion for mistrial been made 'the decision reached would reasonably likely have been different.'" Id. at 750 (quoting Strickland, 466 U.S. at 696, 104 S. Ct. at 2069).

Hammond's primary argument on this point is that the Georgia Supreme Court's decision about the lack of prejudice is due no deference under § 2254(d)(1) because the court looked to whether the outcome of a new sentencing proceeding before a different jury would have reached a different sentencing verdict. He argues that it instead should have looked merely to whether there would have been a different result in this very sentencing proceeding—a mistrial instead of a death sentence, as it turned out. Because it asked the wrong question, Hammond argues, the Georgia Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1).

The problem for Hammond is that he cannot point to any Supreme Court decision that establishes what the prejudice question is when the alleged attorney error is the failure to scuttle a proceeding based on a state law right that not only does not involve enforcement of federal constitutional rights or interests but that also is in some tension with them. Hammond cannot cite any decision in which the Supreme Court has held that if an attorney fails to claim a state law right that is not grounded in any federal constitutional right or interests, courts should not look to whether there is a reasonable probability that the do-over proceeding state law provides would reach a different result.

There is language in some Supreme Court decisions that might be construed in Hammond's favor, if taken out of context, but it is only language and not a holding. That distinction is crucial because the Supreme Court has instructed us that in applying § 2254(d)(1) we are to look only to its actual holdings and not to its dicta. See Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000) ("That statutory phrase refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision. . . . [I]t restricts the source of clearly established law to this Court's jurisprudence."); accord Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006);

Yarborough v. Alvarado, 541 U.S. 652, 660–61, 124 S. Ct. 2140, 2147 (2004);

Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003); Tyler v. Cain,

533 U.S. 656, 664, 121 S. Ct. 2478, 2483 (2001); see also Newland v. Hall, 527

F.3d 1162, 1183 (11th Cir. 2008); Stewart, 476 F.3d at 1208; Osborne v. Terry, 466

F.3d 1298, 1305 (11th Cir. 2006).[21]

Two statements in the Williams opinion illustrate the kind of language we

are talking about here. At one place the opinion explains that counsel's deficient

performance in an earlier case "had not deprived him of any substantive or

procedural right to which the law entitled him." Williams, 529 U.S. at 392, 120 S.

Ct. at 1512–13. At another place the opinion discusses whether the ineffectiveness

of counsel "deprive[d] the defendant of any substantive or procedural right to

which the law entitles him." Id. at 393 n.17, 120 S. Ct. at 1513 n.17. Those two

references in Williams to "the law" might be broadly read to include state as well

as federal law, but the context in which they appear indicates otherwise and shows

---

[21] The Supreme Court has also instructed us not to look to lower court decisions when we are deciding what is clearly established federal law for § 2254(d)(1) purposes. See Williams, 529 U.S. at 365, 120 S. Ct. at 1499; see also id. at 381, 120 S. Ct. at 1507 (Stevens, J., concurring) ("If this Court has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); Musladin, 549 U.S. at 74, 77, 127 S. Ct. at 652, 654 (vacating a decision in which the Court of Appeals "cited its own precedent in support of its conclusion" that two Supreme Court cases clearly established a particular rule of federal law because no holding of the Supreme Court required that interpretation). We have followed that instruction in examining this prejudice issue.

that the holding of the decision does not reach the present situation. In <u>Williams</u> it was "undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." <u>Id.</u> at 393, 120 S. Ct. at 1513. It was that federal constitutional right, not some state law right, which had been lost through counsel's inaction. The Supreme Court had no occasion to decide in <u>Williams</u> the issue before us because this issue was not presented by the facts of that case.

The point is that the Supreme Court has never decided whether the prejudice standard that applies when attorney error results in loss of, or interference with, a federal constitutional right or interest also applies when the loss is only of a state law right that is not congruent with federal constitutional rights or interests. Because the Supreme Court has never decided that issue, we cannot say that the Georgia Supreme Court's resolution of the issue is contrary to or an unreasonable application of clearly established federal law. <u>See</u> <u>Wright v. Van Patten</u>, 552 U.S. 120, __, 128 S. Ct. 743, 747 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court 'unreasonably applied clearly established Federal law.'") (internal brackets altered and citation omitted); <u>Musladin</u>, 549 U.S. at 76, 127 S. Ct. at

113

653–54 (holding that even though Supreme Court decisions clearly established the test for inherent prejudice in cases involving state-actor conduct in the courtroom, a state court decision applying a different prejudice test for private-actor conduct was not contrary to or an unreasonable application of those decisions).

The Musladin case seems particularly apt here. In it the clearly established prejudice rule developed in cases involving state-actor conduct could have been extrapolated or extended to private-actor conduct, but the Supreme Court recognized that § 2254(d)(1) does not permit extrapolation or extension. Instead, that provision looks only to what the Supreme Court has actually held. For that reason, the Court concluded that "[g]iven the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court 'unreasonably applied clearly established Federal law.'" 549 U.S. at 77, 127 S. Ct. at 654 (internal brackets omitted). The same is true here. Given the lack of any holding from the Supreme Court regarding the prejudice test applicable to an attorney error that forfeits only a state law right with no federal constitutional underpinnings, we cannot say the Georgia Supreme Court unreasonably applied clearly established federal law in looking to whether there is any reasonable probability of a different

114

sentence verdict if a mistrial had been demanded and the case presented to a new jury.

Alternatively, even if the issue were before us anew, we would decide that Hammond has not shown the required prejudice from his counsel's action in objecting and requesting a curative instruction instead of moving for a mistrial. The purpose of the prejudice component of an ineffective assistance of counsel claim is to ensure the reliability and fundamental fairness of the proceeding. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064 (stating that the prejudice component "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). The Georgia parole concealment statute does not promote or safeguard the fairness or reliability of a sentence proceeding. To the contrary, as we have explained, the statute suppresses truthful information and keeps the jury ignorant of crucial facts that would inform its sentencing decision. It is one thing to recognize that a state may enact a statute that keeps information about parole from the jury even though doing so hobbles the jury's ability to make a reasoned moral choice at sentencing. It is quite another thing to say that failure to enforce the remedies the state statute provides renders the sentence proceeding unfair or unreliable.

**4.**

We affirm the district court's denial of relief on Hammond's ineffective assistance of counsel claim relating to the prosecutor's remark about parole eligibility, which violated O.C.G.A. § 17-8-76. We do so because we believe that the Georgia courts' adjudication of that claim is not contrary to or an unreasonable application of clearly established federal law, within the meaning of 28 U.S.C. § 2254(d)(1), as to either the performance or prejudice components of that claim. Alternatively, even if no deference were owed under § 2254(d)(1), we would reach the same conclusion.

**AFFIRMED.**